456 So.2d 729 (1984)
Arthur Lee CHRISTIAN
v.
STATE of Mississippi.
No. 54347.
Supreme Court of Mississippi.
August 29, 1984.
*730 Johnnie E. Walls, Jr., Walls, Buck & Irving, Greenville, for appellant.
Bill Allain, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:
Arthur Lee Christian was convicted of rape by the Circuit Court of the First Judicial District of Bolivar County, Mississippi, in violation of Mississippi Code Annotated § 97-3-65(2) (Supp. 1983). When the jury was unable to fix a penalty, the court sentenced Christian to a term of thirty-five (35) years imprisonment with the Mississippi Department of Corrections. We affirm.
Christian assigns the following three errors which he contends were committed by the trial court:
1. The Court erred in refusing to direct a verdict for appellant, or, in the alternative, granting him a new trial inasmuch as he was convicted on the uncorroborated testimony of the prosecutrix.
2. The Court erred in refusing appellant's instructions numbered D-2, D-3 and D-5, relating to the duty of the victim to resist.
3. The verdict of the jury is contrary to the overwhelming weight of the evidence.
Christian is a 23-year old black man who lives in Bolivar County, Mississippi, and the victim is a 17-year-old white high school student who also resides in Bolivar County, Mississippi.
Christian admits the fact that he and the victim had sexual intercourse some time between 11:30 p.m. and 12:45 a.m. on the rainy evening of October 7-8, 1981, in her 1981 Cutlass automobile on a country road known as Waxhaw Road in Bolivar County. His defense to the charge of rape was the consent of the victim. The victim testified to the contrary that Christian blocked her path with his automobile on a narrow highway and forced her to drive him, abandoning his car, to a lonely spot on the Waxhaw Gin Road, where he forcibly raped her by threatening to kill her.
In summary, the victim testified that on the afternoon of October 7, 1981, she went to Gunnison, Mississippi, to visit her boyfriend at his grandmother's home. At about 11:30 p.m. she parted company with her boyfriend and began returning to her own home in her brown 1981 Cutlass automobile. As she was about to turn onto the main street in Gunnison, Mississippi, which leads to Highway 1, a car went past her and she had to stop in order to avoid being hit. She continued down the main street in Gunnison to the intersection of Highway 1, where the same car that had nearly hit her had stopped and the driver's arm was out of the window waiving her down. She did not stop but went around the car and headed down Highway 1 at a speed of about 40 to 45 miles an hour. At this time she was passed by the same automobile traveling at a high rate of speed.
As she proceeded down Highway 1 just before it reached the Waxhaw Gin Road crossing she saw the same car parked diagonally in the middle of the road blocking both lanes. She did not attempt to pass around the vehicle on the shoulders of the road because they were narrow, muddy, and they sloped into a ditch. When she stopped, a man got out of the car and approached her vehicle. She cracked the window about 6 inches to see what he *731 wanted. While they were conversing, he glanced into the back seat of her vehicle and she instinctively turned around to look also. When she turned back around he had reached his arm through the window, unlocked her door and was opening it. Her attempt to lock the door immediately was unsuccessful because she drove with the seat pulled up close to the wheel which put the door lock behind her. According to the victim, Christian took her keys, told her to unlock the passenger door and then went back to his car. He drove his car off Highway 1 and parked on the Waxhaw Gin Road, facing towards the Gin. She stated that she did not flee from her car at this point because she knew of no buildings, homes, or woods in the area in which to seek refuge and she figured that he could outrun her anyway.
He returned to her car and told her to turn onto Waxhaw Gin Road because he lived two miles down the road and wanted her to take him home. She started to continue down Highway 1 but he grabbed the steering wheel and forced her to turn the car down Waxhaw Road. As they passed the Gin, he said that he had to get back to Arkansas because he was "wanted". He told her to stop on a curve after the Gin where he said he could make it from there. She did so. He then told her to turn off the lights and the car motor. When she refused, he reached over and did it himself.
Next he ordered her to take off her clothes, but she said no. When he threatened to undress her himself, she told him she would comply, as she was frightened and did not want him to touch her. He told her that he had a gun, as she began to undress, and that he would kill her if he had to. He got into the back seat and undressed and told her to get in the back seat and lie down. He then held her down and had sexual intercourse with her twice. She testified that she was too frightened to resist because he said that he had killed two other people and it wouldn't hurt him to kill her. She explained that she did not scratch him because she did not have fingernails to scratch with and she did not fight because he was bigger than she was. When she resisted his third act of intercourse, he began to reach for a gun he said he had in the front seat, so she submitted again. After the third time, she crawled to the front seat and tried to get her clothes on, but could not. She opened the door to get out and dress and he grabbed her wrist, telling her to get back in the car. She hurriedly dressed and returned to the driver's seat.
He told her to turn her car around and drive back to his car. She testified that he repeatedly asked her if she would tell anybody what happened and warned her that if she did, he would come back and kill her. When she could not find a place to turn around, he became angry and moved from the back to the driver's seat, turned the car around, and returned to his vehicle. After he got out of her car and repeated his warning, she moved back to the driver's seat, turned on to Highway 1 toward Gunnison, and sped to her boyfriend's house. Her assailant turned his car around and fell in pursuit but, because she had a head start, she reached the Gunnison exit before he could catch her. In her last view of him, she saw his car turn onto another road that goes by Amiel Earp's house.
She identified Christian as the man who had raped her that night and further stated that she had never seen him before that night. It was her testimony that she submitted to Christian because she believed that he had a gun, had killed two other people, and would kill her if she put up a fight.
Her boyfriend testified that he followed her out of town on that night, as was his custom, when he stopped to get a Coke. By the time he headed down Highway 1 he could see no car lights ahead. He testified that, in order to make a U-turn on Highway 1 he had to go down to Waxhaw Gin crossing and use part of the Waxhaw road to complete the turn. At the intersection he saw a cream-colored Chevrolet Impala with a black top parked on the Waxhaw Gin *732 Road. He recognized this car as belonging to Christian, whom he knew.
He testified that when the victim reached his house and told him what happened, she was shaking and crying uncontrollably. He and his father took her to Rosedale, Mississippi, to report the rape, where he gave Deputy Estes a description of Christian's Impala. Deputy Estes testified that her condition at the time was "hysterical". They then proceeded to Pace to pick up her mother and went to Delta Medical Clinic in Greenville. Her mother testified that she repeatedly sobbed, "if I tell you, he'll kill me".
Christian's version at trial of the events of the evening in question was as follows. As he was leaving Gunnison on the main street at about 11:30 p.m., he recognized an automobile following him up to the Highway 1 intersection. When the car pulled alongside, the driver turned on the interior light and he recognized her as "this lady I had been going with". He stated that no conversation occurred; she just waved her hand for him to follow. He followed her down Highway 1 and passed her before they reached the Waxhaw turnoff. He put his turn signal on and she blinked her lights, in response, so he stopped there. He walked back to her car, and talked with her. He testified that they had planned the rendezvous in advance and that she told him she wanted to be with him. He moved his car from Highway 1 onto Waxhaw Gin Road where she pulled up beside him. He got into her car and they drove down Waxhaw Gin Road a half a mile or more. There they parked on the road and chatted for a while. Then, at her instigation, they undressed, got into the back seat and engaged in sexual relations twice.
Afterwards, Christian testified that he told her that he would not see her anymore and she replied that she did not want to break it up. She returned him to his car and he drove back toward Gunnison in order to return home by the less direct but better paved road which passes by Amiel Earp's house.
Christian admitted at trial to having lied to the police officers who arrested him later that evening on several incriminating points. First, he lied about the clothes he had on that night which matched the victim's description. The pants and underwear also had blood stains on the crotch which connected him with the victim who had started her period that evening. Second, he lied when he told them he had gone to Gunnison in a gray Malibu and denied owning his car, which fit the victim's and her boyfriend's description. Third, he denied that he had had sex that night. Fourth, he lied when he told the officers that he had not been on Highway 1 or Waxhaw Gin Road that night. He testified that he told these lies because it is unpopular for whites and blacks to have sex, and also because he was sleepy during the interrogation.
At the close of the state's case, appellant's counsel moved for a directed verdict which was overruled. After all the evidence was in, the appellant renewed his motion for a directed verdict and the court again overruled the motion.
The jury found Christian guilty of rape but was unable to fix the penalty. The next day, April 22nd, 1982, the court sentenced the defendant to a term of thirty-five years with the Mississippi Department of Corrections.
That same day, defendant filed a written waiver of his right to appeal. On April 23, after the end of the April term of circuit court, Christian's present attorneys requested the court's permission to file a motion for a new trial or a judgment non obstante veredicto in order to perfect his right to appeal. On April 29, 1982, defense counsel filed a motion for a new trial. The record does not reflect what action the trial court took on either of these requests.

DID THE COURT ERR IN REFUSING TO GRANT APPELLANT'S INSTRUCTIONS NUMBERED D-2, D-3, and

D-5?
As assignment number 1 and assignment number 3 lend themselves to joint discussion, *733 we will begin with appellant's assignment of error number 2.
The trial court rejected instructions D-2, D-3 and D-5, and instead granted instruction C-25, which states:
The Court instructs the jury that while the victim of a rape has a duty to use all reasonable physical resistance available to her, under the circumstances then and there existing, to prevent from being raped, physical resistance on the part of the victim is not necessary if the proof shows beyond a reasonable doubt that she surrendered because of fear arising out of a reasonable apprehension of death or great bodily harm.
Instruction D-2 reads:
The Court instructs the jury that a mere tactical surrender by an alleged rape victim in the face of an assumed superior force is not enough. The complaining witness must resist with all physical resources reasonably available to her under the existing circumstances.
Thus, if you find from the evidence in this case that the complaining witness, ..., did not resist with all physical resources reasonably available to her in the existing circumstances, you shall find the defendant not guilty.
Instruction D-2 embodies the law as stated in Moss v. State, 208 Miss. 531, 45 So.2d 125 (1950); and Lee v. State, 322 So.2d 751 (Miss. 1975), to the effect that a mere tactical surrender in the face of an assumed superior physical force is not enough, but that the victim must resist with every resource available. Appellant has emphasized that the victim admits that she never saw a weapon and did not show any signs of having been physically abused. The trial court's instruction C-25 embodies this Court's most recent decision upon the element of force in rape cases, Davis v. State, 406 So.2d 795, 801 (Miss. 1981), and Fields v. State, 293 So.2d 430 (Miss. 1974). Instruction D-2 was properly refused because it fails to indicate, as in Davis, that force is not a necessary ingredient of rape if the failure of the victim to resist resulted from reasonable apprehension that she would be greatly injured or killed if she resisted.
Appellant's refused instruction D-3 states:
The Court instructs the jury for the defendant that the victim of an alleged rape should resist an attack to force sexual intercourse upon her by every physical power she may have, but, if it is undertaken by the State to show she did not resist because of threats or placing her in fear, the State must prove all such threats beyond all reasonable doubt, also that the threats made, taking into consideration the deforment (sic) and demeanor of the defendant as shown, as to whether or not the female was actually put in fear of her life, and that such fear of the defendant caused her to submit to his advances and were of a character to cause her to give up her virtue.
This instruction is flawed because it identifies itself as being given by the defendant, in violation of Rule 5.03, Uniform Rules of Circuit Court. Further, the instruction was properly refused because court instruction C-25 required the jury to find that "the proof shows beyond a reasonable doubt that she surrendered because of fear arising out of a reasonable apprehension of death or great bodily harm". Instruction D-3 was thus cumulative with instruction C-25 and the trial court is not required to grant several instructions on the same question in different verbiage. Jones v. State, 381 So.2d 983, 991 (Miss. 1980).
Appellant's requested instruction D-5 states:
The Court instructs the jury that before you can convict a Defendant in this case you must believe from the evidence beyond a reasonable doubt that the Defendant willfully, forceably and against the will of the prosecutrix, ..., raped her and if you have a reasonable doubt arising out of the evidence or from the want of evidence as to whether this is true or not, then it is your sworn duty to return a verdict of not guilty.
*734 This instruction also contains the same defect as instruction D-2 in its failure to indicate that force is not a necessary ingredient of rape where the victim's failure to resist was due to a reasonable fear of great bodily harm. The court properly refused to grant instruction D-5.
DID THE COURT ERR IN REFUSING TO GRANT A DIRECTED VERDICT FOR THE APPELLANT OR, IN THE ALTERNATIVE, GRANT HIM A NEW TRIAL, INASMUCH AS HE WAS CONVICTED ON THE UNCORROBORATED TESTIMONY OF THE PROSECUTRIX?

and
WAS THE VERDICT OF THE JURY CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
A procedural problem exists in connection with the motions for directed verdict. In Banks v. State, 394 So.2d 875, 877, this Court held that,
A motion for a directed verdict on the grounds that the state has failed to make out a prima facie case must state specifically wherein the state has failed to make out a prima facie case. In the absence of such specificity, the trial court will not be put in error for overruling same.
In this case, defense counsel made a general motion for directed verdict on the ground that the state failed to sustain its burden of proof. Defense counsel's argument in support of his motion was not included in the record, so the record does not reflect what he asserted were the specific defects in the state's case. Defense counsel renewed the same general motion after all the evidence was in "for the same reasons that we outlined [at the close of the state's proof]". Assuming that defense counsel argued that the state had failed to prove all the elements of the crime charged, the particular deficiencies he saw in the state's case are not in the record.
Banks v. State sets out the controlling principle on the question of directed verdict, and for that reason we cannot say the court committed error in denying the motion. Assuming arguendo that defense counsel had met the test of Banks, we are satisfied that the assignment would still be without merit.
The standard of review in judging the sufficiency of the evidence on a motion for directed verdict requires that we accept as true all the evidence favorable to the state, together with reasonable inferences arising therefrom, to disregard the evidence favorable to the defendant, and if such evidence would support a verdict of guilty beyond a reasonable doubt, the trial court's denial of the motion must be affirmed. Carroll v. State, 396 So.2d 1033, 1035 (Miss. 1981).
Under this rule the evidence in this case is sufficient to support a guilty verdict. The conflict between the testimony of the appellant and the prosecutrix was properly resolved by the jury. Lee v. State, supra, at 753.
There is no merit to the complaint that Christian was convicted on the uncorroborated testimony of the prosecutrix. This Court recognizes as corroborating evidence the victim's physical and mental condition after the incident, as well as the fact that she immediately reported the rape. Brooks v. State, 242 So.2d 865, 868 (Miss. 1971); Lang v. State, 230 Miss. 147, 159, 87 So.2d 265 (1956). Also, the totally uncorroborated testimony of a rape victim is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other evidence. Otis v. State, 418 So.2d 65, 67 (Miss. 1982), Davis v. State, supra, at 801. In Davis, we found that the element of force had been proven even though, as in this case, there was no weapon used and there was no sign of external injury. Id. at 801.
The appellant's first assignment of error also asserts that the trial court erred in refusing to grant a motion for a new trial. As pointed out in the statement of *735 facts, no motion for a new trial was filed with the court before the end of the term of court. The record also shows that the trial court failed to enter an order nunc pro tunc allowing appellant's counsel to file a motion for a new trial after the term of court had ended. The trial court cannot be held in error on a matter which was not properly presented for its decision. Ponder v. State, 335 So.2d 885 (Miss. 1976).
As to whether or not the verdict of the jury was contrary to the overwhelming weight of the evidence, Christian did not present this issue to the trial court by way of a motion for new trial before the end of the term of court, nor did he receive permission to file such a motion after the court term ended. In order to contend on appeal that the verdict is contrary to the overwhelming weight of the evidence, the appellant must have first presented the issue to the trial court in a motion for a new trial. Ponder v. State, 335 So.2d 885 (Miss. 1976).
We, therefore, conclude there is no merit to appellant's assignments of error number 1 and number 3.
In summary, the trial court did not commit error in refusing to grant the three requested instructions, as they were either defective and/or cumulative. Further, it was not error to deny the motion for a directed verdict or, in the alternative, the motion for a new trial. In circumstances such as these, the testimony of the prosecutrix was enough to get to the jury. Further, the verdict of the jury is not contrary to the overwhelming weight of the evidence. A proper jury issue was made and presented to the jury and that jury properly resolved it. We, therefore, affirm.
AFFIRMED.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, DAN M. LEE, PRATHER and ROBERTSON, JJ., concur.
PATTERSON, C.J., not participating.