# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01115-SCT

*ARCHIE QUINN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/30/2014 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| TRIAL COURT ATTORNEYS: | FRANK CLARK |
| | FORREST ALLGOOD |
| | CHOKWE LUMUMBA |
| | IMHOTEP ALKEBU-LAN |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: HUNTER N. AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LISA L. BLOUNT |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/19/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1. A jury convicted Archie Quinn of capital murder, and the trial judge sentenced him to life in prison, without the possibility of parole. Quinn appeals to this Court, arguing (1) that the jury was incompletely instructed on the elements of the crime, and (2) that he received ineffective assistance of counsel. We affirm Quinn's conviction and sentence, but

we dismiss Quinn's ineffective-assistance-of-counsel claim without prejudice so that he may raise it in a post-conviction proceeding, should he so choose.

## FACTS AND PROCEDURAL HISTORY

¶2.    In the early morning hours of September 28, 2008, Terry Johnson called 911 from a neighbor's house and reported that someone had been "shooting in [his] house." Johnson reported that he had gotten out of the house, but that his girlfriend was still inside. Johnson identified Archie Quinn as the shooter and reported that Quinn had shot him in the hip with a shotgun.

¶3.    Deputies responded to the scene and met Quinn driving toward them up the narrow road that led to Johnson's trailer. Quinn exited his vehicle and shot himself in the head with a shotgun. The deputies secured Quinn's shotgun and procured medical help for him. Some of the officers then proceeded to Johnson's trailer, where they discovered Stacy Gray's body lying in the bedroom. A grand jury subsequently indicted Quinn on four counts.[1]

### *Pretrial Proceedings*

¶4.    Shortly after Quinn appeared for his arraignment, his attorney filed a motion and asked the trial judge to hold a competency hearing and to order that Quinn was not competent to stand trial at that time. The parties then entered into an Agreed Order for Mental Evaluation. The doctors at the Mississippi State Hospital at Whitfield were to determine if Quinn had the "sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in the preparation of his defense," and if he had a "rational as well

---

[1]The capital-murder count was severed from the other counts and is the only count at issue in this appeal.

as a factual understanding of the nature and the object of the legal proceedings against him[.]" The doctors also were to determine if Quinn was "mentally retarded" pursuant to the United States Supreme Court's decision in *Atkins v. Virginia.*[2]

¶5. The doctors at Whitfield ultimately provided the trial court with four reports detailing their competency findings. The first report stated that the doctors were "not able presently to offer opinions to a reasonable degree of medical and psychological certainty" regarding either Quinn's competence to stand trial or whether he was mentally retarded. After additional evaluation, the doctors issued a second report, in which they concluded unanimously that Quinn had the "sufficient present ability" to consult with his attorneys, to understand the nature of the legal proceedings against him, and to knowingly and intelligently waive and/or assert his constitutional rights.

¶6. In the third report—which followed additional evaluation—Dr. Reb McMichael opined that he no longer could state with a reasonable degree of medical certainty that Quinn was competent to proceed. But in the fourth and final report—again, following additional evaluation—both Drs. McMichael and Amanda Gugliano concluded that it was "now again [their] opinion, to a reasonable degree of medical and psychological certainty," that Quinn was competent to proceed.

¶7. The trial judge held a competency hearing a few days before trial. The State asked the trial judge to "take judicial knowledge of all matters and facts contained in the court file in this cause number including the latest report from Dr. Reb McMichael at the Mississippi

---

[2]*Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

State Hospital at Whitfield." The State rested at that point, and Quinn presented no evidence. The trial judge found "beyond a reasonable doubt that Mr. Quinn [was] competent to proceed to trial," and he entered an order confirming his bench findings that day.

¶8.     The trial judge also held a hearing to determine if ***Atkins v. Virginia*** precluded the death penalty in Quinn's case.[3] The trial judge heard testimony from several witnesses, both on behalf of Quinn and for the State. He ultimately granted Quinn's motion, finding that Quinn had "met his burden of proof by a preponderance of the evidence that the death penalty is not a sentencing option in this particular case."

   ***Trial***

¶9.     Terry Johnson testified that he and Fanny Johnson divorced in early 2008, and that Stacy Gray then moved in with him after Fanny moved out. Johnson and Gray had begun dating several years before, while Johnson was still married. Gray previously had been in a relationship with Archie Quinn, but Johnson did not know Quinn.

¶10.    Johnson testified that he and Gray went to a casino in Philadelphia on the night of September 27, 2008. While at the casino, Johnson received a call from Fanny, who told him that Quinn was looking for Gray. Fanny ultimately gave Johnson's number to Quinn, who then called Johnson looking for Gray. Johnson and Gray were at the slot machines about an hour and a half later when Quinn walked up to them. Johnson and Quinn had a conversation, and "not one voice [was] raised." Then Quinn and Gray talked a couple of times, and Quinn

---

[3]Quinn had filed a Motion to Preclude Imposition of Death Penalty, asking the trial judge to prevent the State from seeking the death penalty.

4

hung around the casino for awhile after that, but he did not approach them again. Johnson and Gray left the casino around 3:00 a.m. the morning of September 28 and headed home.

¶11. Johnson testified that Gray woke him up around 4:30 a.m. and asked if he heard a horn blowing. Gray told him she thought it was Quinn "out there blowing and [calling]." So Johnson got up and looked outside, but he did not see anything. Not long after that, Quinn called and said that he had been down to their house "blowing and calling," but that nobody had heard him. Quinn said that he had some things of Gray's and that they needed to "come out and get it," but Johnson said it was too early for that. Quinn hung up, but about fifteen minutes later, he came up the driveway, "blowing from the top of the road." Johnson raised his kitchen window and told Quinn that he could leave Gray's things in the yard, or that he could bring them back later.

¶12. At that point, Quinn's "voice started to [elevate.]" Johnson told Quinn that he could take Gray's stuff or leave it, but that he needed to "get out from down here." Johnson walked from his kitchen window to his sliding doors to see if Quinn was leaving, but "then shots went to firing." Quinn "came out the back of his car and just turned around and just went to opening fire" with a shotgun, and he hit Johnson in the side. Johnson identified Quinn as the man who fired the shots.

¶13. Gray started screaming, and she and Johnson moved to the master bedroom. Johnson testified that the "shots were steady going off . . . He [Quinn] was still shooting up in the house. Shots was just – just constantly going." Gray tried to get Johnson to hide in the

5

shower with her, but he told her that he had to get out and get help.[4] Johnson crawled out the master bathroom window, ran to a neighbor's house, and called 911. He continued to hear shots as he was crawling out the window, and he heard more shots after he got 911 on the line. While Johnson was on the 911 call, the dispatcher informed him that another call had come in, and he recognized that number as belonging to a prepaid cell phone that he owned.[5]

¶14. The jury then heard testimony from the Oktibbeha County 911 director, and the State played both 911 calls in open court and provided the jury with transcripts of the calls.[6] Dr. Adele Lewis performed Gray's autopsy, and she testified that Gray had shotgun wounds to her head and her torso, as well as a handgun wound to her head. Dr. Lewis testified that any of the three wounds would have been fatal, and she determined that Gray's cause of death was "multiple ballistic wounds."

¶15. Deputy Andrew Fountain testified that he responded to the 911 call that morning. As he and a couple of other officers proceeded toward Johnson's trailer, they saw a small car coming toward them. The lead officer radioed that the driver was the person they were looking for, so they stopped their cars to block his path. Quinn got out of his car with a shotgun, went behind the car, and shot himself in the face. The officers secured the shotgun and procured medical help for Quinn.

---

[4]Johnson testified that he could not find either of his cell phones.

[5]This call captured what was going on inside the trailer, with the sounds of shots being fired and Gray moaning.

[6]Quinn's counsel previously had objected (outside the presence of the jury) to the introduction of the 911 call from the prepaid cell phone, under Mississippi Rule of Evidence 403. But the trial judge denied Quinn's motion and held that the call was admissible.

6

¶16. Crime-scene technician Robert Elmore recovered several shotgun shells and at least one 9 mm shell casing from the crime scene. Elmore also recovered a jammed 9 mm semiautomatic pistol from Quinn's car, and other officers previously had recovered Quinn's semiautomatic shotgun. Elmore testified that another officer recovered seven "live" 12-gauge shotgun rounds and one "live" 9 mm round from Quinn's pants. Mississippi Crime Laboratory employee Starks Hathcock testified that he positively had matched ten of the recovered shotgun shell casings to Quinn's shotgun. And Hathcock also was able to match the 9 mm shell casing found in the shower to Quinn's 9mm pistol, as well as the 9mm projectile recovered from Gray's face.

¶17. Quinn moved for a directed verdict after the State's case-in-chief, which the trial judge denied. Quinn called two witnesses in his defense, and the State offered one rebuttal witness before finally resting. The trial court instructed the jury on capital murder, first-degree murder, and heat-of-passion manslaughter. The jury found Quinn guilty of capital murder, and the judge sentenced him to life in prison, without the possibility of parole. The trial judge denied Quinn's post-trial motion, and he now appeals, arguing (1) that the jury was "incompletely instructed on the elements of the crime," and (2) that he received ineffective assistance of counsel.

## DISCUSSION

### 1. The jury was properly instructed.

¶18. This Court reviews the grant or denial of proposed jury instructions for an abuse of discretion. *Victory v. State*, 83 So. 3d 370, 373 (Miss. 2012). "No one instruction should

be singled out." ***Id.*** This Court reviews jury instructions as a whole to determine if any error occurred. ***Id.*** "'A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" ***Id.*** (citations omitted). In short, "'if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.'" ***Id.*** (citations omitted).

¶19.    Here, Instruction D-1b provided, in pertinent part:

> The Court instructs the Jury that the Defendant, Archie Quinn, has been charged with the offense of Capital Murder.
>
> If you find from the evidence in this case beyond a reasonable doubt that:
>
>> 1.  On or about September 28, 2008 in Oktibbeha County, Mississippi;
>>
>> 2.  That Stacy Gray was a human being; and
>>
>> 3.  That with or without any deliberate design to effect death, without authority of law and not in necessary self defense, the Defendant, Archie Quinn, did kill Stacy Gray;
>>
>> 4.  While the Defendant, Archie Quinn, was engaged in the commission of the crime of burglary of a dwelling;
>>
>> then you shall find the Defendant, Archie Quinn, guilty as charged.
>
> If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, Archie Quinn, not guilty of Capital Murder.

And Instruction S-3A provided:

> The Court instructs the Jury that Burglary, as mentioned in these instructions, means to unlawfully, willfully, feloniously, and burglariously break and enter

8

the dwelling house of another person with the intent to commit a crime, to wit: an assault.

¶20. Quinn argues that Instruction S-3A "simply defines the general statutory elements of the crime of burglary[.]" He argues that the jury "was only vaguely informed that the crime Quinn allegedly intended to commit was 'assault,'" and that the "jury was not apprised of the elements of the crime of assault, much less whether the specific assault allegedly intended was simple assault or aggravated assault." Quinn argues further that the jury was not instructed as to who was the alleged victim of the assault, and that Instruction S-3A did not inform the jury that it must find each element of burglary beyond a reasonable doubt.

¶21. First, because Quinn did not object to Instruction S-3A at trial, we review this claim under plain error,[7] which "requires the finding of not only an error, but one that resulted in a 'miscarriage of justice' affecting the defendant's fundamental rights." ***Windless v. State***, 2015 WL 5730744, at *4 (Miss. Oct. 1, 2015). And because we find that *no error* occurred here, it follows that there is no plain error. We also note that Quinn failed to raise the jury-instruction issue in his post-trial motion, which is another procedural bar to Quinn raising

---

[7]The first burglary instruction offered by the State, Instruction S-3, was identical to Instruction S-3A, with the exception of the phrase "to wit: an assault." When asked by the trial judge about Instruction S-3, Quinn said he had no objection. It was only after the trial judge raised concern about the lack of a *specific* intended crime in S-3 that the instruction was amended and proffered as S-3A. Quinn likewise did not object to S-3A when given the opportunity to do so.

9

that argument for the first time here.[8]  But because this is a capital-murder case, we address the merits of his argument.

¶22.   The elements of burglary are (1) "breaking and entering the dwelling house or inner door of such dwelling house of another"; and (2) "with intent to commit some crime therein." Miss. Code Ann. § 97-17-23(1) (Rev. 2014).  But this Court has explained that the elements of the *intended* crime are *not* elements of burglary.  *See Daniels v. State*, 107 So. 3d 961, 964 (Miss. 2013).  As such, the State is not "required to prove each element of the 'intended crime' with the same particularity as is required when a defendant is charged only with the crime intended."  *Newburn v. State*, 205 So. 2d 260, 266 (Miss. 1967).  In short, only the *intent* to "commit some crime, be it a felony or a misdemeanor, is . . . an element of the crime of burglary."  *Booker v. State*, 716 So. 2d 1064, 1068 (Miss. 1998).  And "[o]nly the intent need be proven to establish the second element of the crime of burglary."  *Moore v. State*, 344 So. 2d 731, 735 (Miss. 1977).

¶23.   Recently, in *Windless*, this Court addressed an argument very similar to Quinn's argument here.  There, Windless argued that the trial judge failed to instruct the jury on the elements of larceny as the "underlying offense" of his burglary.  *Windless*, 2015 WL 5730744, at *2.  In dismissing that argument, this Court said:

> [We have] held that larceny is commonly understood to connote stealing or theft.  *Conner v. State*, 138 So. 3d 143, 150 (Miss. 2014) (citing *Commonwealth v. Lawrence*, 11 Mass. App. Ct. 990, 418 N.E.2d 629, 631 (1981)). The State submitted sufficient evidence for the jury to find that

---

[8]*See, e.g.*, *Watts v. State*, 492 So. 2d 1281, 1290-91 (Miss. 1986) ("Furthermore, Watts is procedurally barred from raising this issue on appeal, since it was not listed as grounds in his motion for j.n.o.v. or a new trial.") (citation omitted).

Windless feloniously broke into and entered the victim's house with the intent to steal. *See **Butler v. State***, 217 So. 2d 3, 4 (Miss.1968) ("Criminal intent may be proved by circumstantial evidence, and may be inferred from the time and the manner in which the entry was made, and the conduct of the accused after the entry."). The fact that there are two statutory categories of larceny is of no import, as the burglary statute simply requires the intent to commit "some crime therein [.]" Miss. Code Ann. § 97–17–23(1) (Rev. 2014). *See **Ashley v. State***, 538 So. 2d 1181, 1184 (Miss. 1989) ("[T]he word 'crime' in our burglary statutes includes misdemeanors as well as felonies.").

***Windless***, 2015 WL 5730744, at *4.

¶24.    We find that ***Windless*** controls here. Our caselaw holds that only the *intent* to commit some crime need be proven in order to establish the second element of burglary—the State need not also prove the *elements* of that intended crime. As such, the trial judge sufficiently instructed the jury here, as it was instructed that burglary in Quinn's case meant feloniously entering the dwelling house of another with the intent to commit an assault—facts that the trial judge said the jury must find beyond a reasonable doubt.

¶25.    And just as "larceny" is commonly understood to mean stealing, we find that "assault" is commonly understood to mean causing or attempting to cause bodily injury to another. And as in ***Windless***, the State presented sufficient evidence for the jury to find that Quinn feloniously broke into Johnson's house with the intent to assault. And also as in ***Windless***, "[t]he fact that there are two statutory categories of [assault] is of no import, as the burglary statute simply requires the intent to commit '"some crime therein[.]"' ***Id.*** at *4. "Simply put," as this Court said in ***Windless***, reversal is not mandated here, "because the elements of [assault] are not elements of the crime with which [Quinn] was charged." ***Id.*** at *3.

### 2. Quinn's ineffective-assistance-of-counsel claims are not appropriate for review on direct appeal.

¶26. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This Court employs the two-pronged test announced by the United States Supreme Court in *Strickland* to determine if counsel has been ineffective. *Ransom v. State*, 919 So. 2d 887, 889 (Miss. 2005).

¶27. A defendant first must demonstrate that his counsel's performance was deficient. *Id.* at 889. And in order to demonstrate deficiency, a defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action '"might be considered sound trial strategy."' *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984). Secondly, a defendant must show that, but for his counsel's deficient performance, there is a "reasonable probability" that the result of the proceeding would have been different. *Foster v. State*, 687 So. 2d 1124, 1130 (Miss. 1996).

¶28. "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008). "This is because during direct appeals the Court is limited to the trial court record in its review of the claim, *and there may be instances in which insufficient evidence exists within the record to address the claim adequately." Id.* (emphasis added). *"In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue*

12

*through a petition for post-conviction relief."* **Id.** (emphasis added). This Court may, however, address the merits of an ineffective-assistance-of-counsel claim on direct appeal if "'the record affirmatively shows ineffectiveness of constitutional dimensions[.]'" **Taylor v. State**, 167 So. 3d 1143, 1146 (Miss. 2015) (citation omitted).

¶29.    Here, Quinn argues that his trial counsel was ineffective in four specific ways: (1) for failing to challenge Quinn's competency at the July 22, 2014, competency hearing; (2) for failing to request a **M'Naghten** [9] evaluation in furtherance of an insanity defense; (3) for failing to object to Quinn's defective indictment, which failed to specify whether the State alleged the "underlying crime" to burglary to be simple assault or aggravated assault; and (4) for failing to object to the prosecutor playing Gray's 911 recording again during closing arguments. We find that "insufficient evidence exists" within this record to address Quinn's ineffectiveness claim adequately, so we therefore dismiss that argument without prejudice, so that Quinn may bring it in a petition for post-conviction relief, should he so choose.

**CONCLUSION**

¶30.    We find that the trial judge properly instructed the jury and therefore affirm on that issue. We also find that this record does not "affirmatively show" ineffective assistance of counsel. As such, we affirm Quinn's conviction, but we dismiss his ineffective-assistance-of-counsel claim without prejudice to his right to raise it in a proper petition for post-conviction relief.

---

[9] *See* **M'Naghten's Case**, 8 Eng. Rep. 718 (1843).

¶31. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE OR EARLY RELEASE, AFFIRMED.**

**WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶32. The jury convicted Quinn of capital murder, which, in this case, required the jury to find beyond a reasonable doubt that he broke and entered a dwelling with the intent to commit an assault. Although I believe the trial judge erred by failing to provide the jury with any information about, or explanation of, what is required for the crime of assault, I find the error is not reversible for two reasons.

¶33. First, as the majority points out, Quinn failed to preserve the error in the trial court, requiring him to establish plain error. Under the facts of this case, the jury could not have been misled, so there was no manifest miscarriage of justice and no plain error.[10] And, second, even if the error had been preserved, I would—for the same reason—find that it was harmless beyond a reasonable doubt.

¶34. My disagreement with today's majority centers around its perpetuation of the mistake this Court made in *Windless v. State*, a burglary case wherein a majority of this Court approved a trial judge's failure to instruct the jury on the meaning of larceny, which,

_____

[10] *Morgan v. State*, 793 So. 2d 615, 617 (Miss. 2001) (citing *Gray v. State*, 549 So. 2d 1316, 1321 (Miss. 1989); *Kuehne & Nagel (AG & Co.) v. Geosource, Inc.*, 874 F.2d 283, 292 (5th Cir. 1989)).

according to the prosecution, was the intended crime.[11] Citing the ***Windless*** decision, the majority states:

> Our caselaw holds that only the *intent* to commit some crime need be proven in order to establish the second element of burglary—the State need not also prove the *elements* of that intended crime.[12]

¶35. To be clear, I did not suggest in ***Windless***, and I do not suggest here, that the State must *prove* the elements of the intended crime. I do, however, believe the State should be required to prove the accused intended to commit the elements of the intended crime. And while the majority correctly observes that the facts of this case would fall under the general understanding of the meaning of an assault, and that Quinn's actions qualify under any definition, cases may not always be so simple.

¶36. The majority finds "that 'assault' is commonly understood to mean causing or attempting to cause bodily injury to another."[13] This definition is incomplete and does not take into account that a person may intend to commit an assault without any intent to cause, or attempt to cause, bodily injury to another.[14] Using the majority's definition, a jury would return a "not guilty" verdict for a person who breaks and enters a dwelling with the intent to

---

[11] ***Windless v. State***, 2015 WL 5730744 (Miss. Oct. 1, 2015).

[12] Maj. at ¶ 24.

[13] Maj. at ¶ 25.

[14] Miss. Code Ann. § 97-3-7(1)(a) (Supp. 2015) ("A person is guilty of simple assault if he . . . attempts by physical menace to put another in fear of imminent serious bodily harm.").

15

frighten, but not harm, a person therein. But, had the jury properly been instructed as to the elements of an assault, it would have returned a "guilty" verdict.

¶37. The intended crime in a burglary can be any crime under state or federal law, and the majority fails to recognize that there is no general understanding of the meaning of many crimes.[15] For instance, I do not believe we safely can say the general public understands the elements of misprision of felony.[16] And I doubt that most lawyers or judges, without reference to the statute, could state the requirements for statutory rape.[17] Nor do I believe most people understand what is required to violate the malicious mischief statute,[18] or many of the more than 1,000 federal statutory crimes.[19]

¶38. So my concern with today's majority, as well as the majority in *Windless*, is this Court's blanket rule in burglary cases, that the trial court only need advise the jury of the name of the crime the accused intended to commit, with no duty to explain the elements or requirements for the intended crime. For this reason, I respectfully concur in result only.

**KITCHENS AND KING, JJ., JOIN THIS OPINION**.

---

[15] Miss. Code Ann. § 97-17-23 (Rev. 2014) ("Every person who shall be convicted of breaking and entering the dwelling house or inner door of such dwelling house of another . . . with intent to commit some crime therein . . . .").

[16] 18 U.S.C. § 4.

[17] Miss. Code Ann. § 97-3-65 (Rev. 2014).

[18] Miss. Code Ann. § 97-17-67 (Rev. 2014).

[19] 18 U.S.C. §§ 1, *et seq*.