# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01617-COA

FREDRICK EUGENE BLISS A/K/A FREDRICK        APPELLANT
E. BLISS A/K/A FREDRICK BLISS A/K/A
FREDERICK EUGENE BLISS

v.

STATE OF MISSISSIPPI        APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/25/2017 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/22/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

GREENLEE, J., FOR THE COURT:

¶1.     A Harrison County grand jury indicted Fredrick Bliss for one count each of kidnapping, robbery, and sexual battery. A jury found Bliss not guilty of kidnapping or robbery but convicted him of sexual battery. The Harrison County Circuit Court sentenced Bliss to serve twenty-five years in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole or early release. On appeal, Bliss argues the circuit

court erred by (1) giving jury instruction S-6, which instructed the jury on the uncorroborated testimony of a sex-crime victim, and (2) admitting into evidence a photograph that showed the victim's cervical injuries. Finding no error, we affirm Bliss's conviction and sentence.

**FACTS**

¶2. On the evening of October 15, 2015, J.R.[1] attended a bachelorette party at the Beau Rivage Resort and Casino (the Beau Rivage) in Biloxi, Mississippi. J.R. left the Beau Rivage around 2 a.m. on October 16, 2015. The Beau Rivage's video footage showed that J.R. and Bliss entered the same elevator and then exited the elevator on the same floor of the parking garage. J.R. testified at trial that as she got into the elevator, Bliss asked what floor she needed. J.R. responded that the button for her floor had already been pushed. Other than this quick exchange, J.R. testified that she did not converse with Bliss.

¶3. According to J.R., she neither noticed another vehicle following her home nor had a conversation with any other drivers as she drove home. Upon reaching her apartment complex, J.R. testified that she had to circle around the parking lot before finally finding a spot in an unlit section of the parking lot. After she parked her vehicle, J.R. texted her friends from the bachelorette party to let them know that she had arrived home. J.R. testified that she had exited her vehicle and walked several feet away when someone grabbed her from behind in a choke hold. J.R. testified that the man who grabbed her also shoved an object behind her ear. At the time of the attack, J.R. thought the assailant had a knife. J.R.

---

[1] We use initials to protect the victim's identity.

2

stated that she tried to scream but was unable to make any noise. The assailant told J.R. multiple times to shut up. J.R. urinated on herself as she struggled with the assailant. As the assailant dragged her to the ground between two vehicles, J.R. stated that she tried to grab onto a vehicle to catch herself. J.R. testified that the assailant was very strong and seemed considerably larger than her. The assailant shoved J.R.'s face sideways into the ground and covered her eyes with his hand. J.R. testified that the assailant positioned himself on top of her and pushed her legs away from each other. The assailant rubbed his hand on the outside of J.R.'s underwear, which he noted was already wet.

¶4.     At some point during the attack, the assailant pulled J.R.'s underwear down to her ankles. J.R. testified that she begged for the assailant to stop and told him that she had children. J.R. stated that the assailant stuck his finger inside her vagina and commented that she was already wet and that he could understand why she had several children. The assailant also touched J.R.'s breasts and asked whether she had implants. J.R. testified that the assailant asked her where the pen was. At the time of the question, J.R. thought the assailant wanted the personal identification number, or PIN, to her debit card.

¶5.     J.R. testified that the assailant suddenly stopped what he was doing, stood up, and threatened to kill her if she turned around to look at him. Although her underwear was still around her ankles and she was missing her car key and phone, J.R. ran toward the apartment complex's elevators. When she reached her apartment, J.R. testified that she woke up her husband and told him about the attack.

¶6. J.R.'s husband testified that he was asleep on the couch when J.R. ran into their apartment. J.R.'s husband further testified that his wife was frantic as she told him about the attack and that her underwear was still around her ankles. J.R.'s husband retrieved a flashlight and his pistol, and he called 911 as he walked toward the parking lot. J.R.'s husband quickly searched the parking lot for the assailant and J.R.'s missing car key and phone. After failing to find either the assailant or the missing items, J.R.'s husband returned to the apartment and remained there while J.R. told the 911 operator about the attack.

¶7. The police arrived and searched the area. During their investigation, the police discovered fingerprints on the windows and side door of a Jeep parked in the parking lot. Officer Bryan Wallace with the Biloxi Police Department testified that he photographed the handprints on the Jeep. Officer Wallace further testified that he observed a black government-issued Skilcraft ink pen on the ground by the Jeep's rear tire. Officer Wallace stated, however, that he forgot to collect the ink pen after he was asked to take some photographs of J.R.'s vehicle. Officer Wallace testified that the police never recovered J.R.'s missing car key or phone.

¶8. After the police left the apartment complex, J.R.'s husband went back outside to continue his search for J.R.'s missing key and phone. During his search, he found an ink pen by the rear tire of a vehicle. J.R.'s husband testified that he sent a picture of the ink pen to Investigator Ray Akins with the Biloxi Police Department. Investigator Akins asked J.R. and her husband to deliver the ink pen to the police station. After the police identified Bliss as

4

a suspect in the attack on J.R., Investigator Michael Melasecca obtained and executed a warrant to search Bliss's vehicle. Investigator Melasecca testified that he discovered three "U.S. Skilcraft government[-]style" ink pens in the center console of Bliss's vehicle. Investigator Melasecca testified that he had been in the United States Air Force for four years and that he had used the Skilcraft pens when he was in the military. Investigator Melasecca further stated that he "associate[d] them [(the pens)] with being a military[-]style pen" and that they "were common and [found] almost any place in the military where you would have to write . . . ."

¶9.     The same day as the attack, J.R. and her husband went to Singing River Hospital (Singing River) so J.R. could undergo a sexual-assault examination. Nancy Story, an emergency-room nurse at Singing River, testified that she had been trained as a sexual-assault nurse examiner and that she performed J.R.'s examination. The circuit court accepted Story as an expert in sexual-assault examinations. J.R. described the attack to Story and provided Story with the clothing she had worn at the time of the attack. Story testified that the underwear J.R. had worn at the time of the attack was still wet and smelled of urine. The clothing and evidence that Story collected during the examination were sent to the Mississippi Forensics Laboratory for analysis.

¶10.    Story testified that J.R.'s physical examination revealed bruising to J.R.'s right eye, a pinpoint bruise behind her right ear, and some bruising to her left leg. Story also stated that a pelvic examination revealed some redness and bruising to J.R.'s vagina and cervix. Story

testified that J.R.'s cervical injuries were consistent with J.R.'s account of the attack and her statement that the assailant had digitally penetrated her vagina. Story testified that she had documented J.R.'s injuries by photographing them. Without any objection from the defense, the State offered into evidence several photographs of J.R.'s injuries, including the photograph of her cervical injuries. Story testified that the photograph of J.R.'s cervix documented injuries consistent with a "finger forcefully being inserted into her vagina" that could "cause the bruising to the cervix" depicted by the photograph. Story further testified that her findings from J.R.'s physical examination were consistent with the history that J.R. had provided regarding the attack.

¶11.    Investigator Akins testified that during his investigation of the attack, he reviewed video footage from both the Beau Rivage and J.R.'s apartment complex. The Beau Rivage's video footage showed J.R. and Bliss enter the same elevator and then exit onto the same floor of the parking garage. The video footage from J.R.'s apartment complex showed J.R. arrive and park her vehicle. Bliss's vehicle, with the headlights turned off, entered the parking lot behind J.R.'s vehicle. Investigator Akins testified that the area of the parking lot where J.R. parked was "pitch dark" and that a person would have been unable to see anything without a light. The apartment complex's video footage failed to capture the attack on J.R. but showed J.R. running toward the elevators with her underwear around her ankles. The video footage also showed Bliss backing out of his parking spot at the apartment complex with his headlights still turned off as he began to exit the parking lot. From the video footage, the

6

police identified Bliss as a suspect in the assault on J.R. Investigator Akins testified that he interviewed Bliss, who waived his *Miranda*[2] rights and provided a statement.

¶12.    At trial, Bliss testified on his own behalf. He stated that he had watched the New Orleans Saints game at his residence the evening of October 15, 2015, before going to the Beau Rivage. As Bliss left the Beau Rivage on the morning of October 16, 2015, he and J.R. exited the elevator onto the same floor of the parking garage. Bliss stated that he said, "[H]ey, little mama," to J.R. because he "was trying to get her attention." Bliss further stated that he made "cat calls" to J.R. and said, "[P]sst, psst, psst, psst, things of that nature." Bliss testified that J.R. smiled at him but did not verbally respond as she walked toward her vehicle.

¶13.    Bliss stated that he saw J.R. again while he was driving on the interstate. Bliss testified that he pulled up beside J.R.'s vehicle and once again tried to get her attention by making cat calls, flashing his vehicle lights, and honking his horn. According to Bliss, J.R. waved her hand at him and indicated that he should follow her. Bliss testified that J.R. did not roll down her vehicle window but that he could see inside her vehicle because her windows were not tinted. Bliss stated that after J.R. signaled for him to follow her, he pulled behind J.R.'s vehicle and followed her to her apartment complex. As he approached the guard house at the front of J.R.'s apartment complex, Bliss turned off his vehicle's headlights. Bliss explained that he had served in the United States Navy and that he always

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

dimmed or turned off his vehicle headlights when he approached a military base so as not to blind the guards. As a result, Bliss stated that when he approached J.R.'s apartment complex, he instinctively turned off his vehicle headlights until he had passed the guard house. Bliss testified that he parked his vehicle in the first available parking spot he found and then remained inside his vehicle until he saw J.R. park.

¶14. According to Bliss, he walked up to J.R. after she exited her vehicle, put his hands around her waist, and again said, "[H]ey, little mama." Although J.R. was initially startled, Bliss stated that she "got comfortable, [and] leaned back into [him]." Bliss testified that he and J.R. touched and caressed until J.R. told him that they could not continue their interaction because she was married and had children. Bliss stated that after J.R.'s comments, he stopped caressing her, got into his vehicle, and left the apartment complex. Bliss testified that he once again kept his vehicle headlights turned off until he passed the guard house at the front of the apartment complex.

¶15. On rebuttal, the State called J.R. as a witness. Contrary to Bliss's testimony, J.R. stated that her vehicle had tinted windows. J.R. further testified that she was certain she had not rolled down the windows of her vehicle at any point during her drive home from the Beau Rivage. According to J.R., she never drove with her vehicle's windows rolled down.

¶16. After considering all the evidence, the jury found Bliss not guilty of kidnapping or robbery but convicted him of sexual battery. The circuit court sentenced Bliss to serve twenty-five years in MDOC's custody with no eligibility for parole or early release. Bliss

8

filed an unsuccessful motion for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Bliss appeals.

## DISCUSSION

### I. Jury Instruction S-6

¶17. Bliss contends the circuit court erred by giving jury instruction S-6, which stated, "The Court instructs the jury that the uncorroborated testimony of a sex-crime victim is sufficient to support a conviction if accepted as true by the finder of fact." Although he acknowledges that the Mississippi Supreme Court recently upheld an identical instruction in *Pitts v. State*, 291 So. 3d 751, 752-53 (¶¶30, 34) (Miss. 2020), Bliss maintains that instruction S-6 failed to fully instruct the jury. According to Bliss, instruction S-6 "emphasize[d]" and "provide[d] strong support for" J.R.'s testimony while simultaneously failing to instruct the jury on the proper "qualifying test" to apply to a sex-crime victim's uncorroborated testimony.

¶18. We review the circuit court's decision to give or deny a proposed jury instruction for abuse of discretion. *Id.* at 755 (¶17). We must read the jury instructions "as a whole to determine if . . . [they] were proper." *Id.* at 757 (¶33) (quoting *Sharkey v. State*, 265 So. 3d 151, 156 (¶19) (Miss. 2019)). Where the given jury "instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id.* (quoting *Quinn v. State*, 191 So. 3d 1227, 1232 (¶18) (Miss. 2016)).

¶19. In *Pitts*, the defendant argued that an identical jury instruction "was peremptory in

9

nature, constituted an improper comment on the evidence, was argumentative, and . . . encouraged circumvention of the [S]tate's obligation to prove guilt beyond a reasonable doubt." *Id.* at (¶32). Based on precedent, however, the *Pitts* court held that the complained-of jury instruction "constitute[d] an accurate statement of the law applicable to th[e] case and did not improperly comment on the evidence." *Id.* at 758 (¶39). Moreover, after reviewing the jury instructions as a whole, the *Pitts* court concluded that the circuit court had clearly given the jury proper instruction on the relevant caselaw. *Id.* at 759 (¶39).

¶20.    As in *Pitts*, the circuit court here instructed the jury "not to single out one instruction alone as stating the law but . . . [to] consider these instructions as a whole." The circuit court further instructed the jury that as the "sole judge[] of the facts in this case," the jury held "exclusive province . . . to determine what weight and what credibility . . . [to] assign[] the testimony and supporting evidence of each witness in this case." Also as in *Pitts*, the circuit court here instructed the jury "not to single out any certain witness or individual point or instruction and ignore the others." Further, the circuit court informed the jury of the elements required for sexual battery and the State's burden to prove every element beyond a reasonable doubt.

¶21.    After reviewing relevant caselaw and the jury instructions as a whole, we find no abuse of discretion in the circuit court's decision to give instruction S-6. The supreme court has held that an instruction identical to S-6 accurately stated the applicable caselaw and provided no improper comment on the weight of the evidence. *Id.* at 758 (¶39). Further,

10

when read as a whole, we find that the jury instructions given here "fairly announce[d] the law of the case and create[d] no injustice . . . ." *Id.* at 757 (¶33) (quoting *Quinn*, 191 So. 3d at 1232 (¶18)). As a result, we conclude that Bliss's argument lacks merit.

## II. Photograph of Cervical Injuries

¶22. Bliss next asserts that the circuit court erred by admitting into evidence the photograph of J.R.'s cervical injuries. Although the defense raised no objection at trial to the photograph, Bliss contends that the photograph's admission amounted to plain error. Because Story testified about her observations of J.R.'s cervical injuries, Bliss argues the prejudicial nature of the photograph outweighed any probative value and that the photograph served only to provoke and inflame the jury.

¶23. Bliss's "failure to object at trial waives any assignment of error on appeal absent plain error." *Brisco v. State*, 295 So. 3d 498, 509 (¶23) (Miss. Ct. App. 2019). We apply the plain-error rule only "when a defendant's substantive or fundamental rights are affected." *Id.* To constitute plain error, there must be an error that "resulted in a manifest miscarriage of justice." *McFarland v. State*, 297 So. 3d 1110, 1119 (¶33) (Miss. Ct. App. 2020) (quoting *Smith v. State*, 984 So. 2d 295, 301 (¶14) (Miss. Ct. App. 2007)). The procedural bar notwithstanding, we address the merits of Bliss's argument to determine whether the photograph's admission prejudiced his defense and resulted in a manifest miscarriage of justice.

¶24. "[A] court may exclude relevant evidence if its probative value is substantially

11

outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." M.R.E. 403. We review a circuit court's admission or exclusion of photographs for abuse of discretion. *Ambrose v. State*, 254 So. 3d 77, 135 (¶186) (Miss. 2018). "The discretion of a trial judge to admit photos in criminal cases[] runs toward almost unlimited admissibility regardless of gruesomeness, repetitiveness, and the extenuation of probative value." *Id.* at (¶187) (quoting *Bennett v. State*, 933 So. 2d 930, 946 (¶53) (Miss. 2006)). Even a "gruesome, grisly, unpleasant, or even inflammatory" photograph may still "be admitted so long as it has 'probative value and its introduction serves a meaningful evidentiary purpose.'" *Beasley v. State*, 136 So. 3d 393, 400 (¶21) (Miss. 2014) (quoting *Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993)). A photograph that "supplements or clarifies witness testimony" possesses "a meaningful evidentiary purpose" and is therefore admissible. *Ambrose*, 254 So. 3d at 135 (¶187) (quoting *King v. State*, 83 So. 3d 376, 378 (¶7) (Miss. 2012)).

¶25. The photograph at issue here contained probative value and possessed meaningful evidentiary purposes. The photograph not only assisted Story's explanation of J.R.'s cervical injuries but also aided the jury's understanding of the nature and extent of J.R.'s injuries. Furthermore, the photograph supplemented and tended to support J.R.'s testimony regarding what transpired between her and Bliss in the apartment complex's parking lot. In addition, the photograph aided the State in proving sexual penetration, which our statutory law and

caselaw define as an essential element of sexual battery. *See* Miss. Code Ann. § 97-3-95(1) (Rev. 2014); *Gilmore v. State*, 282 So. 3d 601, 607 (¶23) (Miss. Ct. App. 2019). Because the photograph possessed probative value that outweighed any potential prejudice to Bliss, we cannot say that the admission of the photograph resulted in an abuse of discretion or a manifest miscarriage of justice. We therefore find this assignment of error lacks merit.

**CONCLUSION**

¶26. Because we find no error, we affirm Bliss's conviction and sentence for sexual battery.

¶27. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, J.; McCARTY, J., JOINS IN PART. SMITH, J., NOT PARTICIPATING.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶28. I agree with the majority's resolution of issue II. I write separately to discuss jury instruction S-6. The Mississippi Supreme Court has approved such instructions, *Pitts v. State*, 291 So. 3d 751, 757-59 (¶¶30-39) (Miss. 2020), and this Court is obligated to follow Supreme Court precedent. Nevertheless, I cannot ignore the fact that an instruction like S-6 is undeniably problematic because it unfairly highlights a victim's testimony, potentially confuses or misleads jurors, and pertains to "a concept . . . that is irrelevant to a jury's function as [a] fact-finder." *Ludy v. State*, 784 N.E. 2d 459, 460 (Ind. 2003). The better

13

practice would be to prohibit such clearly impermissible comments on the evidence.[3]

¶29.    Even though another instruction directed the jury that it was within their "exclusive province" to apply weight to each witness's testimony, instruction S-6 highlighted the victim's testimony and said that it was enough to convict Bliss.  It was unnecessary to give instruction S-6 because there is no reason for the jurors to think that the victim's testimony would be inadequate unless it is bolstered by other evidence.  There is an exceedingly thin semantic line between instructing the jurors that they *can* weigh the victim's testimony more heavily than any other evidence and instructing them that they *must* weigh it more heavily. I cannot conclude that instructions like S-6 in this case are not comments on the evidence regardless of the prior Mississippi cases that say otherwise.  Repeating this improper conclusion does not make it any less improper.  Mississippi should join the jurisdictions that recognize the fallacy behind such instructions.

¶30.    Instruction S-6 also tends to contradict a different instruction that the jurors should not "single out any witness or . . . instruction" during their deliberations.  This is particularly true since the jurors could have interpreted instruction S-6 "to mean that baseless testimony should be given credit and that they should ignore inconsistencies, accept without question

---

[3] "The judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence; but at the request of either party he shall instruct the jury upon the principles of law applicable to the case."  Miss. Code Ann. § 99-17-35 (Rev. 2015).  "An instruction . . . on the weight of the evidence or [that] singles out and gives undue prominence to certain portions of the evidence is erroneous." *Bester v. State*, 212 Miss. 641, 647, 55 So. 2d 379, 381 (1951).

the witness's testimony, and ignore evidence that conflicts with the witness's version of events." *Ludy*, 784 N.E. 2d at 460. Said differently, the instruction "invites the jury to believe the victim, explaining that to confirm the authenticity of her statement, the jury need only hear her speak." *State v. Stukes*, 787 S.E.2d 480, 483 (S.C. 2016). As such, "lack of corroboration [should be] a proper subject of argument, not [a] jury instruction." *Gutierrez v. State*, 177 So. 3d 226, 233 (Fla. 2015). Finally, it is misleading and unnecessary to instruct the jury that a victim's uncorroborated testimony is sufficient to sustain a conviction because the jury is wholly unconcerned with the *sufficiency* of the evidence. Sufficiency is a legal question that is subject to a de novo review on appeal. *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018). In fact, uncorroborated victim instructions appear to stem from cases that addressed the legal principle at issue solely in the context of sufficiency questions. *Massey v. State*, 992 So. 2d 1161, 1164 (¶14) (Miss. 2008) (collecting cases).

¶31. As a final matter, defense counsel in other cases should be cautious that similar instructions are actually supported by the evidence.[4] In this case, the victim's testimony was not entirely uncorroborated. *See Christian v. State*, 456 So. 2d 729, 734 (Miss. 1984) ("This Court recognizes as corroborating evidence the victim's physical and mental condition after the incident, as well as the fact that she immediately reported the rape."). Bliss admitted that

---

[4] In this case, defense counsel objected to instruction S-6 because it placed a "premium" on the victim's testimony. I interpret this to be an objection that the instruction was a comment on the evidence. That objection did not preserve a claim that instruction S-6 was unsupported by the proof at trial. *See Montana v. State*, 822 So. 2d 954, 959 (¶12) (Miss. 2002).

he followed J.R. home and turned his headlights off as he entered the parking lot. He was identified by his car's license plate. Bliss also admitted that he grabbed J.R. around her waist and startled her. J.R.'s husband corroborated her testimony that she was frantic and that her underwear was around her ankles. The treating nurse testified that J.R.'s examination was consistent with a sexual assault. The nurse also noted that J.R.'s clothes were covered in urine, which also corroborated J.R.'s account that she lost control of her bladder during the assault. If defense counsel had objected that the instruction was not supported by the evidence, I would posit that this case should be reversed and remanded for a new trial. It appears that such instructions are being given more frequently in Mississippi, but as with any instruction, the evidence should be there to support it.

**McDONALD, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**