# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00760-COA

CARLOS JONES                                                           APPELLANT

v.

STATE OF MISSISSIPPI                                                    APPELLEE

DATE OF JUDGMENT:              04/24/2024
TRIAL JUDGE:                   HON. MARGARET CAREY-McCRAY
COURT FROM WHICH APPEALED:     SUNFLOWER COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:       J. MATTHEW EICHELBERGER
                               MADELINE M. ILES
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:             WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 03/10/2026
MOTION FOR REHEARING FILED:

        **EN BANC.**

        **McCARTY, J., FOR THE COURT:**

¶1.     Four men planned to rob a house in the Delta. In the midst of the robbery, one of the victims was shot by one of the intruders. The victim later died of his injuries.

¶2.     Years later, one of the four men gave a statement to law enforcement, and another cut a deal. The remaining men were indicted for two crimes—capital murder with the underlying crime of burglary and armed robbery. The remaining three co-defendants were tried together. Over objection, the State used the co-defendant's statement as evidence against the others. The jury found them guilty. Finding no error requiring reversal, we affirm.

## FACTS

¶3. On August 10, 2012, Merio Harris and his roommate Nathan Williams were robbed in their home in Drew, Mississippi. During the course of the robbery, Williams was shot and killed.

¶4. Harris testified that on the evening of the shooting, he and Williams had sold marijuana from their house. After selling marijuana, they retired to their individual bedrooms, and Harris began counting his money. At approximately 10:30 or 11:00 p.m., two men wearing ski masks and carrying firearms entered Harris's bedroom. Harris testified that he did not know the men and could not see their faces because they wore masks. One man pointed a gun at Harris and told him to "give it up and lay down," referring to the money Harris was counting. Harris complied. Several minutes later, Harris heard a gunshot in another part of the house. He got up, walked to the hallway, and discovered Williams lying on the floor. Harris called 911 and then drove Williams to the hospital. Williams eventually died from his injuries.

¶5. Chief Deputy Marvin Flowers of the Sunflower County Sheriff's Department investigated the robbery and murder. During his investigation, Chief Deputy Flowers spoke with Harris, as well as Brian Hannon, Sophia Sharkey, and Cartisha Banks. Banks testified that on the night of the incident, she, Sharkey, and Hannon rode in Sharkey's truck to Harris and Williams's house to purchase marijuana. They pulled up to the house and Hannon exited the vehicle. Banks testified that as Hannon approached the door to the house, three men "with masks and guns" came out of the door and went to the back of the house. Hannon then entered the house, and Sharkey pulled her truck out of the driveway to follow the three men with guns. Sharkey and Banks proceeded to follow the men, and they observed the men get

2

into a dark-colored truck. Sharkey, Banks, and Hannon then followed behind Harris as he drove Williams to the hospital. While driving to the hospital, Sharkey announced that she had spotted the masked men's vehicle. Sharkey called the police and provided the tag number of the vehicle.

¶6. Harris testified that a day after the shooting, he found a shell casing in his bedroom. Harris alerted the sheriff's department, and Harris testified that someone from the sheriff's department came to his house and collected the shell casing. At trial, Chief Deputy Flowers denied that a shell casing was recovered from Harris's home.

¶7. The case eventually went cold until 2013, when Investigator Bill Staten from the Leflore County Sheriff's Department contacted Chief Deputy Flowers and informed him that he had detained someone with information related to the case. Chief Deputy Flowers went to the Leflore County Sheriff's Department and spoke with Davontay Brown. After speaking with Davontay, Chief Deputy Flowers searched Davontay's cell phone and Facebook page. Based on information he gleaned from these searches, Chief Deputy Flowers obtained a warrant for Edwin Brown, Jabrandon Green, Derrion Eloby, and Carlos Jones.

¶8. In 2015, a Sunflower County grand jury indicted Brown, Eloby, Green, and Jones for one count of capital murder with the underlying crime of armed robbery and a standalone count of armed robbery. In 2021, the original indictment was nolle prossed due to a defect, and a second Sunflower County grand jury indicted the co-defendants for one count of capital murder with the underlying crime of burglary and one count of armed robbery. Each charge included an added firearm enhancement.

¶9. Before trial, Green—after agreeing to a plea deal with the State and agreeing to testify

3

against Brown, Eloby, and Jones—unsuccessfully moved to sever his trial from his co-defendants.

¶10. Brown, Eloby, and Jones (collectively, the Defendants) were jointly tried on January 30, 2024 through February 2, 2024. At trial, the jury heard testimony from Harris, Banks, Chief Deputy Flowers, and Green, as well as Dr. Mark LeVaughn, a forensic pathologist at the Mississippi State Medical Examiner's Office; Officer Kevin Nelson of the City of Horn Lake Police Department; Investigator Darrell Saxton of the Sunflower County Sheriff's Department; Mark Boackle of the Mississippi Forensics Laboratory, an expert in the field of firearms and toolmarks; and Audra Brown, Brown's wife.

¶11. After Chief Deputy Flowers testified, the defendants moved for a mistrial. Counsel for the Defendants claimed that Chief Deputy Flowers indicated through his testimony that evidence was intentionally destroyed and that some of the State's evidence was not disclosed to the Defendants. The Defendants also asserted that these evidentiary issues were relevant to their motion to dismiss based on a speedy trial violation, and they renewed their speedy trial motion. After hearing arguments from counsel, the trial court denied the motions for a mistrial or dismissal, and the trial continued.

¶12. Green testified that on the night of the shooting, he and the Defendants drove to Harris and Williams's residence with the intention of robbing the house. According to Green, Brown drove the men in his silver Pontiac car. The men drove past the house to make sure the coast was clear, and then Brown parked his car on a gravel road, out of sight. Green, Eloby, and Jones then exited the vehicle carrying guns and ski masks. Green testified that Jones entered the house through a window and then opened the door to allow Green and

4

Eloby inside. Green claimed that during the robbery, Eloby ordered Williams to lie down, and when Williams refused, Eloby shot him.

¶13. Dr. LeVaughn testified that Williams was shot in the left shoulder and died as a result of internal bleeding. Dr. LeVaughn opined that Williams's manner of death was homicide. During Williams's autopsy, a bullet was recovered from his body, and the sheriff's department sent the bullet to the Mississippi Forensics Laboratory.

¶14. Officer Nelson testified that at approximately 7:30 p.m. on August 11, 2012, the evening after the shooting, he was sitting in a patrol car at an intersection in Horn Lake, Mississippi. Officer Nelson observed that the driver of a passing vehicle was not wearing a seatbelt and the two people inside of the vehicle "appeared noticeably nervous." Officer Nelson proceeded to conduct a traffic stop of the vehicle. Officer Nelson testified that Eloby was one of the two occupants of the vehicle. During a search, officers found 1.6 grams of marijuana separately packaged on Eloby's person, and $190 in cash in $5 denominations. A K-9 search revealed a Taurus 9mm handgun underneath the front passenger seat where Eloby was sitting, and Eloby was charged with possession of a handgun by a minor.

¶15. In April 2021, Chief Deputy Flowers learned that the Horn Lake Police Department had taken possession of Eloby's gun during the traffic stop in 2012. Investigator Darrell Saxton testified that upon orders from Chief Deputy Flowers, he retrieved the gun and logged it into evidence at the Sunflower County Sheriff's Department. Investigator Saxton then took the gun to the Mississippi Forensics Laboratory and advised the laboratory staff that they needed to compare the gun to the projectile (bullet) recovered from Williams's body. According to Investigator Saxton, laboratory staff informed him that they had returned the

5

projectile to Chief Deputy Flowers. Investigator Saxton eventually located the projectile in the evidence room at the sheriff's department, and he returned the projectile to the Mississippi Forensics Laboratory.

¶16. Mark Boackle testified as an expert in the field of firearms and tool marks. Boackle testified that he analyzed Eloby's Taurus 9mm gun and the projectile recovered from Williams's body. Boackle opined that the projectile "bears class characteristics consistent with 9mm." However, in comparing the projectile to the gun, Boackle determined that while the projectile had similar class characteristics with those produced by Eloby's gun, it "could not be positively included or excluded as having been fired in [Eloby's] gun . . . to the exclusion of all other firearms bearing the same class characteristics." Boackle testified that this was due to the mutilation and "insufficient reproduction" of the projectile recovered from Williams's body. Boackle explained that the projectile's outer covering had "ripped away from the core" of the bullet, and this mutilation made it hard to further classify or identify whether the projectile was fired from Eloby's gun. Boackle testified that a projectile jacket can sometimes separate from the core of the bullet when the gun is fired or when the projectile hits something hard like "bone, glass, metal."

¶17. After the State rested its case-in-chief, the Defendants moved for directed verdicts, arguing that the State had not met its burden of establishing a prima facie case of capital murder and armed robbery against the Defendants. The trial court denied the motion.

¶18. The jury ultimately returned a verdict finding the Defendants guilty of capital murder, with the underlying charge of burglary, and armed robbery. For his capital murder conviction, the trial court sentenced Jones to life imprisonment in the custody of the MDOC

6

with the possibility of parole, as he had been a juvenile at the time of the offense. For his armed robbery conviction, the trial court sentenced Jones to ten years in custody, with all ten years suspended and conditioned on his completing five years of post-release supervision, set to run consecutively to his sentence for capital murder.

¶19. Jones filed a motion for a judgment notwithstanding the verdict or a new trial, which the trial court denied.

## DISCUSSION

¶20. On appeal, Jones raises eight points of error. As reflected in his brief:

I. Admission of codefendant Eloby's statement violated Jones's right to confrontation.
II. Jones's counsel was ineffective for not moving to sever.
III. The State's loss of significant evidence violated Jones's due process rights.
IV. Jones's speedy trial rights were violated.
V. The trial court erred in admitting evidence of a gun that could not be tied to the crime.
VI. The State failed to prove the elements of capital murder as charged in the indictment and as instructed to the jury.
VII. The trial court erred in admitting prior bad acts of codefendant Brown.
VIII. Cumulative error requires reversal.

We address each in turn, with added background and procedural history as needed.

### I. Jones' Confrontation Rights were not violated.

¶21. The initial issue raised by Jones challenges the admission of the redacted confession of his co-defendant Eloby.

¶22. Jones argues that "[e]vidence of Eloby's testimonial statement—in the form of testimony from [Chief Deputy] Flowers about what Eloby supposedly said, and a handwritten statement signed by Eloby—was admitted at trial and unjustly implicated Jones in the eyes

7

of the jury." In Jones' view, this was a violation of the Confrontation Clause.

¶23.    At trial and on appeal, the dispute between the Defendants and the State regarding the admission of the redacted confession centers on the application of a recent U.S. Supreme Court case, which addressed the issue of whether a nontestifying co-defendant's confession violates the Confrontation Clause.

¶24.    Adam Samia worked for a "crime lord" in the Philippines who "tasked Samia" and two others "with killing . . . a local real-estate broker[.]" *Samia v. United States*, 599 U.S. 635, 640 (2023).   One of the men, Carl Stillwell, was later arrested by the DEA and cooperated in the investigation of the murder of the broker, including giving a confession. *Id*.

¶25.    Samia was indicted and tried with the others in a joint trial for a variety of crimes. *Id*. Because Stillwell was not going to testify, "[p]rior to trial, the Government moved in limine to admit Stillwell's confession," with an agent reading his "confession in a way that eliminated Samia's name while avoiding any obvious indications of redaction." *Id*. The district court allowed the confession. *Id*.

¶26.    During trial, the Government put on this evidence by having an agent describe Stillwell's confession. *Id*. He stated that Stillwell "described a time when the *other person* he was with pulled the trigger on that woman in a van that he and Mr. Stillwell was driving." *Id*. at 642 (emphasis in original).   The agent also used this "other person" phrasing in other portions of his testimony. *Id*.

¶27.    The testimony came with a limiting instruction by the district court judge, who "instructed the jury that his testimony was admissible only as to Stillwell and should not be

8

considered as to Samia" or the other defendant, and "a similar limiting instruction before the jury began its deliberations." *Id*. The jury found Samia guilty on all counts. *Id*.

¶28. On appeal, Samia attacked the use of the redacted confession; in his view "the admission of Stillwell's confession—even as altered and with a limiting instruction—was constitutional error because other evidence and statements at trial enabled the jury to immediately infer that the 'other person' described in the confession was Samia himself." *Id*.

¶29. Generally speaking, "[t]he Sixth Amendment's Confrontation Clause guarantees the right of a criminal defendant 'to be confronted with witnesses against him.'" *Id*. The "Clause forbids the introduction of out-of-court 'testimonial' statements unless the witness is unavailable and the defendant has had the chance to cross-examine the witness previously." *Id*.

¶30. The United States Supreme Court first determined that "Stillwell's formal, Mirandized confession to authorities, which the Government . . . introduce[d] at trial, is testimonial[.]" *Id*. at 643. And because the confession was "testimonial," the Court concluded it "falls within the [Confrontation] Clause's ambit." *Id*. at 644.

¶31. But that did not end the Court's analysis, because "the Confrontation Clause applies only to witnesses against the accused." *Id*. So "a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant." *Id*.

¶32. The Court determined that "[f]or most of our Nation's history, longstanding practice allowed a nontestifying codefendant's confession to be admitted in a joint trial so long as the jury was properly instructed not to consider it against the nonconfessing defendant." *Id*. at

9

646. Nonetheless, the Court recognized that its "precedents distinguish between confessions that directly implicate a defendant and those that do so indirectly." *Id*. at 652.

¶33. Accordingly, the Court found that per its precedent "and consistent with the longstanding historical practice discussed above, the introduction here of Stillwell's altered confession coupled with a limiting instruction did not violate the Confrontation Clause." *Id*. at 648. Because Stillwell's confession did not "directly inculpate the defendant and was subject to a proper limiting instruction," the Court found the Confrontation "Clause was not violated[.]" *Id*. at 655.

¶34. During Jones' trial, the State was developing the testimony of Chief Deputy Flowers on direct examination. Flowers was asked if he "made contact with a Derrion Eloby," and whether Eloby provided a statement to the authorities. "Tell this jury what he told you," the State continued.

¶35. At this point, counsel for Jones asked to approach the bench and argued the *Samia* case should preclude the witness from discussing what Eloby told him. "Considering the fact that we only have two other individuals aside from my client behind us, that leaves the inference . . . those were the two people that were mentioned in [Eloby's] statement." In defense counsel's view, the admission of the statement "violate[d] very clear United States Supreme Court precedent[.]"

¶36. The trial court recessed to deliberate. It found that allowing Chief Deputy Flowers to testify about what Eloby told him was not precluded by *Samia*, and carefully tailored the proposed exhibit of Eloby's confession to be redacted in accord with precedent. In doing so, the trial court sought to "minimize the obviousness of the redaction."

¶37. Eloby's handwritten statement recounted:

> Went to the house in Drew, MS. Carlos Jones went in threw the window open the door. JaBrandon Green went in. I went in behind him. Stayed at the door for watch out. JaBrandon continued to the back and rob dude. A car pulled up I said a car just pulled up. They ran out toward the door. A shot went off and we left.

¶38. The statement as admitted had whited-out the name of Carlos Jones per the trial court's ruling regarding *Samia*.

¶39. Ultimately, Chief Deputy Flowers testified that Eloby "advised that him and Jabrandon Green" and "a person" went to the house in Drew, where "a person went through the kitchen window," and "a person and Jabrandon and himself . . . robbed" the victim. After this, the redacted statement by Eloby was admitted.

¶40. After cross-examination of Flowers, the trial court informed the jury via a limiting instruction that "the Court allowed the statement of Derrion Eloby to be admitted into evidence in this case. You may consider that statement as evidence only against the defendant Eloby. It should not be considered as evidence against defendants Carlos Jones or Edwin Brown."

¶41. On appeal, Jones does not challenge the method of redaction used for Eloby's written statement, nor the admission of the redacted confession. Instead, Jones argues the alleged error is not the redacted confession standing alone, but rather the chief deputy's statement *combined* with the redacted confession, artfully attempting to sidestep *Samia*.

¶42. Our review of *Samia* reveals that its ruling includes the situation presented here. The jury in *Samia* was not only presented with Stillwell's redacted confession; instead, a DEA agent testified as to the contents of the confession, explaining the confession "described a

11

time when the *other person* he was with pulled the trigger on that woman in a van that he and

Mr. Stillwell was driving." *Samia*, 599 U.S. at 642 (emphasis added). So Samia's argument

on appeal was similar to the one Jones makes here—that "*other* evidence and statements at

trial enabled the jury to immediately infer that the 'other person' described in the confession

was Samia himself." *Id*. (emphasis added).

¶43. The trial court recessed trial proceedings to consider the guidance in *Samia* once it

was raised by defense counsel. Eloby's statement was redacted in accord with precedent.

And the jury was given a limiting instruction by the trial court.

¶44. We find that the introduction of Eloby's redacted statement and Chief Deputy

Flowers' statements that "another person" was with Eloby, combined with the limiting

instruction, complied with the Supreme Court's ruling in *Samia*.

¶45. The trial court carefully considered the matter, and we find it comports with the

Supreme Court's precedent regarding the Confrontation Clause, and as a result, that Jones'

Confrontation Clause right was not violated.

¶46. Next, in passing, Jones also argues his state right to confront witnesses was violated.

*See* Miss. Const., art. 3, § 25 (1890) ("In all criminal prosecutions the accused shall have a

right . . . to be confronted by the witnesses against him"). Jones does not argue the state right

is interpreted differently from the federal right, or that our Constitution of 1890 affords

greater protections in this particular instance. *See, e.g.*, *Okhuysen v. City of Starkville*, 333

So. 3d 573, 582 nn.4, 5 (Miss. Ct. App. 2022) (holding that search and seizure protections

of the Mississippi Constitution afford greater protections than the federal constitutions).

¶47. Instead, Jones relies on a case from the Mississippi Supreme Court where it found that

12

"this Court continues to hold that a violation of the Confrontation Clause by admission of a codefendant's out-of-court statement which implicates the defendant in a crime cannot be cured by the granting of a cautionary instruction such as the ones entered in [that] case." *Smith v. State*, 986 So. 2d 290, 299 (¶29) (Miss. 2008). While the *Smith* Court found that the Confrontation Clause was violated, it ultimately concluded the violation was harmless.

¶48. We find that *Smith* is distinguishable from the facts of Jones' case. First, *Smith* was not applying our state right, but instead interpreting the federal right. And because *Samia* post-dates *Smith* by fifteen years and is the most recent pronouncement from the U.S. Supreme Court, that more recent case controls, not our State Supreme Court's application of pre-existing U.S. Supreme Court precedent.

¶49. Second, in *Smith*, it seems the statements of the co-defendants to law enforcement were not redacted and the State's witnesses appear to have actually used the names of the co-defendants. *Id*. at 293 (¶¶6-7). Furthermore, the testimony of one of the co-defendants directly implicated the others and "[t]he State entered disc recordings of Smith's interrogations as well as transcripts of those recordings." *Id*. at (¶6).

¶50. The situation at hand is different. Here, the written statement from Eloby was carefully redacted so as not to name any co-defendant. During the sequence when the trial court instructed the State to redact Eloby's statement, the trial judge informed the State that "you can't put Mr. Jones's name." And then Chief Deputy Flowers only testified that "a person" assisted in the crime, and the jury was given a limiting instruction.

¶51. After a thorough review of the transcript and the applicable cases, we find no error on these grounds.

13

## II. Jones' ineffective assistance of counsel claim is more appropriately brought during PCR proceedings.

¶52. Next, Jones argues his trial counsel was ineffective for failing to seek a severance from the other co-defendants. According to Jones, "the trial court repeatedly emphasized to Jones's counsel the problems that would inevitably arise in a joint trial," but his "counsel never requested that his case be severed[.]"

¶53. Because there was no such motion made, Jones argues this violates the precept that "the right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In response, the State argues that "counsel's decision not to seek severance was not objectively unreasonable," and was ultimately "a matter of trial strategy that does not amount to deficient performance."

¶54. "[G]enerally, ineffective assistance of counsel claims are more appropriately brought during post-conviction proceedings." *Dartez v. State*, 177 So. 3d 420, 422-23 (¶18) (Miss. 2015). "We will reach the merits on an ineffective-assistance [of counsel] claim only in instances where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Collins v. State*, 221 So. 3d 366, 372 (¶19) (Miss. Ct. App. 2016). "This Court has also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Carnley v. State*, 348 So. 3d 1071, 1079 (¶38) (Miss. Ct. App. 2022).

¶55. While the State briefly addressed the merits of the claim of ineffective assistance, it

14

did not stipulate that the record was complete for purposes of review on direct appeal. "Because the parties did not stipulate that the record was adequate for this Court to review the issue, we will determine whether the record affirmatively shows ineffectiveness of constitutional dimensions." *Id.*

¶56. On briefs and during oral argument, counsel for Jones repeatedly emphasized the prejudice suffered by Jones due to the joint trial with the other Defendants. Counsel pointed to a sequence in the transcripts that occurred pretrial during which the trial court warned counsel for the Defendants of its concern regarding a joint trial:

> I mentioned in docket call that I want to be absolutely sure, since your clients have not been present for any of the hearings that we've had, that, you know, you are discussing with them the individual and joint benefits of how this case is proceeding. Definitely they have the right to remain joined in the trial. It appears that some of them may be in a position where a severance would be granted, and that's not that they have to seek a severance or that the Court is saying that they should, but I think it's paramount in this situation, as I see it developing, that they each be advised of that, the pros and cons of joint versus severed cases and, you know, unequivocally agree to that.
>
> As I said in docket call, if a joint trial is successful, you know, you-all will be considered genius. If it doesn't, the issue of ineffective assistance of counsel could very well surface around the issue of severance. So we just want to make sure that everything is transparent and that everybody is on board going forward.

¶57. The trial court relayed that it felt obliged to bring the issue up "out of an abundance of caution[.]" At a subsequent hearing on the issue of Eloby's statement, addressed *supra*, the trial court again inquired whether counsel for Jones was seeking a severance in light of his argument that his client's Confrontation Clause rights were being violated. Jones' counsel again declined to seek a severance. The trial court indicated, "We are now two weeks before trial. You don't intend to seek a severance?" Counsel answered in the

15

negative.

¶58.   In response, the State argues that whether to grant a severance is within the discretion of the trial court and that there was no indication such a motion would have been granted in this case even if one had been made. Given the trial court's clear, repeated emphasis on this point, as we have recounted above, the State's argument is not supported by the record.

¶59.   Nonetheless, generally speaking "[e]ven the decision of whether to move for severance is within the purview of trial strategy." *Stephney v. State*, 424 So. 3d 302, 308 (¶13) (Miss. Ct. App. 2025). It is "[c]ounsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections [which] falls within the ambit of trial strategy." *Id*.

¶60.   From our vantage point on direct appeal, confined as we are to this record, we cannot ascertain whether this was ineffective assistance of counsel. As our Supreme Court explained in *Dartez*, "[a]n appellate court is limited to the trial-court record in its review of the claim(s), and there may be instances in which insufficient evidence and/or information exists within the record to address the claim adequately." *Dartez*, 177 So. 3d at 423 (¶18). "In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief (PCR)." *Id*.

¶61.   In that case, the question before the Court was whether trial counsel was ineffective because he "should have raised an insanity defense and whether trial counsel should have challenged Dartez's confession," but since resolving that issue "involves facts not fully apparent from the record before us," the Court passed consideration to PCR. *Id*. at (¶20). Just as in that case, Jones may subsequently "assert and argue this claim through a PCR

16

petition," while mindful that he "must first seek leave of th[e] [Supreme] Court before presenting such a petition in the trial court." *Id*.

¶62.    "Because this issue involves our consideration of matters outside the content of the record, we dismiss [the] claim of ineffective assistance of counsel without prejudice to his right to seek permission from the [S]upreme [C]ourt to revisit the issue in a motion for post-conviction relief if he so chooses." *Ellison v. State*, 370 So. 3d 807, 815 (¶35) (Miss. Ct. App. 2023).

### III.    Jones has not shown the loss of evidence was in bad faith.

¶63.    Along with his co-defendants, Jones argues that his right to a fundamentally fair trial was violated due to various due process violations by the State; accordingly, he contends the trial court erred by denying his motions for a mistrial and dismissal.

¶64.    The decision "to grant a motion for a mistrial is within the sound discretion of the trial court. The standard of review for [a] denial of a motion for a mistrial is abuse of discretion." *Dorsey v. State*, 310 So. 3d 1238, 1247 (¶26) (Miss. Ct. App. 2021). "A trial judge need declare a mistrial only when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant's case." *Young v. State*, 281 So. 3d 179, 186 (¶29) (Miss. Ct. App. 2019) (quoting *Hutto v. State*, 227 So. 3d 963, 984 (¶66) (Miss. 2017)). However, we review de novo a trial court's denial of a defendant's motion to dismiss. *Lewis v. State*, 295 So. 3d 521, 531 (¶26) (Miss. Ct. App. 2019).

*Destruction or Loss of Exculpatory Evidence*

¶65.    Jones asserts that the State's destruction, loss, and mishandling of evidence violated his due process rights. He claims that he was prejudiced due to the unavailability of

exculpatory evidence, namely, the missing audio files of recorded witness interviews and Chief Deputy Flowers' sticky notes that he used to draft his final case report. He also asserts that the State erred by mishandling and failing to test the shell casing that Harris claimed he turned over to law enforcement and that the State mishandled the projectile recovered from Williams' autopsy, which deprived him of the ability to prove its exculpatory value.

¶66. We recognize that "[t]he State has the duty to preserve evidence . . . which might be expected to play a significant role in the suspect's defense." *Northup v. State*, 793 So. 2d 618, 623 (¶16) (Miss. 2001) (quotation mark omitted). To determine whether the State violated due process rights based upon destruction or spoliation of evidence, Jones must show the following:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that [Jones] would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018). Jones must meet all three of these requirements to successfully prove that his due process rights were violated. *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶67. Regarding the claim that the State mishandled the projectile recovered from Williams's autopsy, we find nothing in the record to support this claim. Although the testimony at trial reflects that the projectile was damaged, Boackle testified that a projectile's outer covering can sometimes separate from the core of the bullet when the gun is fired or when the projectile hits something hard like "bone, glass, metal." As for the shell casing that Harris claims law enforcement collected from his bedroom, Chief Deputy Flowers testified

at trial and denied that a shell casing was recovered from Harris' home.

¶68. Chief Deputy Flowers also testified regarding his investigation of the shooting. After he developed suspects, he issued arrest warrants for the Defendants. Chief Deputy Flowers testified that he interviewed Eloby in July 2013, and during that time Eloby implicated Green as the person who shot Williams. Chief Deputy Flowers recorded his 2013 interview with Eloby. Eloby also provided a written statement. Chief Deputy Flowers admitted that "throughout the years, [the recorded interview] got misplaced." However, Eloby's written and redacted statement was entered into evidence at trial.

¶69. During cross-examination, counsel for the Defendants questioned Chief Deputy Flowers about his law enforcement training for conducting an investigation. Chief Deputy Flowers agreed that he was trained to keep up with everything relevant to each investigation and include the information in a report. Counsel for the Defendants asked Chief Deputy Flowers about the recordings of his interviews with various witnesses to the shooting. Chief Deputy Flowers testified that over the course of the years, the recordings had been "misplaced."

¶70. Chief Deputy Flowers also testified that as he conducted his investigation in this case, he made notes on a sticky pad and a notepad to help him prepare his offense report. Chief Deputy Flowers admitted that after he prepared his offense report, he did not include his handwritten notes in the case file, explaining "[t]hat was years ago." When asked by counsel for the Defendants where he put his handwritten notes, Chief Deputy Flowers answered, "I don't know where I put them . . . . Probably [threw] them away." Chief Deputy Flowers did not recall when he threw the notes away, explaining, "[t]his has been over 12, 13 years."

19

However, Chief Deputy Flowers testified that the offense report he prepared contained the information from his handwritten notes.

¶71. Counsel for Defendants also questioned Chief Deputy Flowers about arrest warrants he issued for people other than the Defendants, namely, Tasha Green and Vanquilla Johnson. Chief Deputy Flowers stated that he did arrest Tasha Green and Vanquilla Johnson and interviewed them regarding the shooting. Chief Deputy Flowers testified that he recalled taking a written statement from Tasha and Vanquilla and that their statements "should" be incorporated into the case file. Upon reviewing the case file, Chief Deputy Flowers clarified that he did *not* take a written statement from Tasha and Vanquilla. When asked about his prior testimony stating that he *had* taken a written statement from Tasha and Vanquilla, Chief Deputy Flowers explained that the misstatement was due to the long amount of time that had passed since the interviews.

¶72. After Chief Deputy Flowers's testimony, counsel for the Defendants made a tandem motion for a mistrial and a motion to dismiss on the grounds of due process violations and speedy trial violations. The Defendants argued that the State's failure to turn over Chief Deputy Flowers's handwritten statements and notes from the interviews with witnesses Tasha and Vanquilla constituted a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963).[1] The Defendants also argued that the State's failure to preserve certain evidence and

---

[1] On appeal, Jones maintains that the failure to turn over interview notes and handwritten statements was a *Brady* violation. However, the testimony at trial shows that this evidence was either destroyed or did not exist; therefore, the State could not turn it over. This issue is more appropriately addressed by using the three-prong test to determine whether the State's failure to preserve evidence violated the defendant's right to due process, as set forth in *Robinson*, 247 So. 3d at 1234 (¶56).

the destruction of evidence violated their due process rights. The Defendants asserted that they were unaware the statements and notes existed until trial. The Defendants admitted that the content of Chief Deputy Flowers's notes was unknown, but counsel for the Defendants argued that "there is a very strong potential that all this evidence had potential impeachment value upon at least one possible witness, if not more." The Defendants maintained that if the trial court did not grant their motion, then they were entitled to a spoliation-of-evidence instruction based on Chief Deputy Flowers's intentional destruction of evidence.

¶73. In response, the State argued that the Defendants' claims regarding the preservation of evidence did not rise to the level of a due process violation.

¶74. After hearing arguments from counsel, the trial court denied the motions for a mistrial and dismissal. In applying the relevant factors for destruction or spoliation of evidence, the trial court found "[t]here is no clear indication that any of the evidence that is no longer available possesses any exculpatory value." The trial court explained that the discovery made available by the State did not indicate that any statements or information from Tasha and Vanquilla would have been exculpatory concerning the murder and robbery at issue. As to whether the evidence was of such a nature that the Defendants would be unable to obtain comparable evidence by other reasonably available means, the trial court weighed this prong heavily—but not fully—in favor of the Defendants. The trial court explained that no one had presented any evidence to show that Tasha and Vanquilla were unavailable to be interviewed. Finally, the trial court found no evidence to show that Chief Deputy Flowers destroyed the evidence in bad faith. The trial court acknowledged that Chief Deputy Flowers did misplace, lose, and even destroy some evidence, but the trial court determined that this was a result of

the passage of time and not a deliberate effort to destroy evidence.

¶75. After reviewing the record, we find that the trial court did not abuse its discretion in denying Jones' motion for a mistrial or dismissal. Jones failed to show that the evidence at issue possessed apparent exculpatory value. Regarding Chief Deputy Flowers's interviews with Tasha and Vanquilla, Jones presented no evidence to show that they were unavailable to be interviewed; accordingly, Jones failed to show that he was unable to obtain comparable evidence by other reasonably available means. Finally, the record contains no evidence that Chief Deputy Flowers destroyed any evidence in bad faith. *Robinson*, 247 So. 3d at 1234 (¶56).

**IV. Jones' rights to a speedy trial were not violated.**

¶76. Jones next argues that his constitutional and state statutory rights to a speedy trial were violated.

A. The Constitutional Right

¶77. "The United States and Mississippi Constitutions guarantee criminal defendants the right to a speedy trial." *Newell v. State*, 175 So. 3d 1260, 1269 (¶9) (Miss. 2015) (citing U.S. Const. amend. VI; Miss. Const. art. 3, § 26 (1890)). When examining whether a defendant's right to speedy trial was violated, we apply the four-part test developed by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). *Id*. The *Barker* test requires consideration of the following factors: "(1) the length of delay; (2) the reason for delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant has been prejudiced by the delay." *Id*. (citing *Barker*, 407 U.S. at 530-33). The *Barker* Court explained that the four factors are "related factors and must be considered together with such

other circumstances as may be relevant." *Id*. at 533.

¶78. The record reflects that one of the Defendants, Eloby, filed a pre-trial motion to dismiss due to the violation of his right to a speedy trial. At the May 2021 hearing on the motion, trial counsel for both Jones and Brown announced they were joining the motion to dismiss. The trial court subsequently entered an order denying the motion to dismiss.

¶79. "A trial judge's ruling on a speedy-trial claim encompasses questions of fact, including whether there was 'good cause' for a delay and whether the defendant has been prejudiced by any delay." *Berryman v. State*, 337 So. 3d 1116, 1126 (¶33) (Miss. Ct. App. 2021) (quoting *State v. Woodall*, 801 So. 2d 678, 680-81, 687 (¶¶7, 29, 31) (Miss. 2001)). "We must affirm the trial judge's factual findings if they are supported by substantial, credible evidence," and "[w]e will reverse the trial judge's factual findings only if there is no probative evidence to support them and they are clearly erroneous." *Id*. (internal quotation marks omitted).

### 1. *Length of the Delay*

¶80. "The constitutional right to a speedy trial attaches when a person has been accused. Therefore, the speedy-trial clock begins running 'with the defendant's arrest, indictment, or information,' whichever occurs first." *Berryman*, 337 So. 3d at 1126 (¶34) (citation omitted) (quoting *Stark v. State*, 911 So. 2d 447, 450 (¶7) (Miss. 2005)). "'[A]ny delay exceeding eight months is presumptively prejudicial' and requires analysis of the remaining *Barker* factors." *Id*. at 1126-27 (¶34)

¶81. Here, the record shows that Jones was originally indicted with the other Defendants in April 2015 and he was arrested in February 2019. The trial took place in January 2024.

23

The delay in this case was greater than eight months, so we proceed to consider the remaining *Barker* factors in assessing the claim of a speedy trial violation.

2.     *Reasons for the Delay*

¶82.    "Once the delay is deemed presumptively prejudicial, the burden shifts to the prosecution to produce evidence justifying the delay and to persuade the trier of fact of the legitimacy of these reasons." *McBride v. State*, 61 So. 3d 138, 142 (¶9) (Miss. 2011). "This Court must then determine whether the delay is attributable to the State or the defendant." *Berryman*, 337 So. 3d at 1127 (¶36). "Different reasons for delay are assigned different weights." *Id*. "Deliberate attempts to delay the trial in order to hamper the defense are weighed heavily against the State." *Id*. However, "[d]elays caused by the defense, such as requests for continuances, will toll the running of the speedy-trial clock for the length of time attributable to the continuance." *Courtney v. State*, 275 So. 3d 1032, 1042 (¶27) (Miss. 2019). Likewise, "[a]greed continuances are weighed against the defense." *Id*. at (¶29).

¶83.    On appeal, the State maintains that the trial docket reflects that the majority of the delay is attributed to the Defendants' motions for continuance of the trial date. The record reflects that the Defendants were initially indicted on April 20, 2015. The Defendants filed approximately twelve motions for continuances, which the trial court granted on June 23, 2015; November 20, 2015; March 14, 2016; February 28, 2019; July 7, 2019; February 26, 2020; June 24, 2020; October 26, 2020; April 22, 2021; October 8, 2021; and February 10, 2022. The trial docket shows that over half of the orders granting continuances were agreed upon by the State. Eloby also filed a motion for a mental evaluation, which the trial court granted on February 24, 2016.

24

¶84. The motions for continuances were filed by, and granted to, Jones and his co-defendants. This Court has held that "[g]enerally, continuances granted to a co[-]defendant for good cause operate as good-cause delays as to jointly charged defendants." *Harris v. State*, 174 So. 3d 314, 319 (¶23) (Miss. Ct. App. 2015). On appeal, Jones has "offered no evidence that his codefendant's continuances were not for good cause." *Id.* Additionally, as considered *supra*, the record reflects that Jones did not seek a severance from his co-defendants nor did he object to the continuances. *See Bates v. State*, 886 So. 2d 4, 8 (¶11) (Miss. Ct. App. 2004) (finding that a defendant's failure to seek a severance or object to continuances granted to his co-defendant cut against the defendant's speedy-trial claim).

¶85. In its order denying the motion to dismiss for a speedy trial violation, the trial court assessed this prong and held that "[t]he practical reality of the court's congested docket, Eloby's pending mental evaluation and the (agreed) continuances should not be weighed against the State." The trial court properly found that the delays from the continuances should not be weighed against the State. *See Harris*, 174 So. 3d at 319 (¶24).

### 3.      *Assertion of Right to a Speedy Trial*

¶86. "Although it is the State's duty to ensure that the defendant receives a speedy trial, a defendant has some responsibility to assert this right." *Taylor v. State*, 162 So. 3d 780, 785 (¶10) (Miss. 2015) (quoting *Bateman v. State*, 125 So. 3d 616, 630 (¶49) (Miss. 2013)). The Mississippi Supreme Court has held that "a defendant's failure to demand a speedy trial between his arrest and indictment is 'critical' to the analysis of a speedy-trial claim." *Id.* The supreme court has weighed this prong against a defendant where the defendant allows a "significant amount of time to pass after arrest before demanding a speedy trial[.]" *Id.*

25

¶87. On appeal, Jones argues "the record suggests Jones joined Eloby and Brown's speedy trial arguments at the pretrial hearing on May 5, 2021, and again during trial." This is not a clear invocation of the right, and raising it during trial is not an invocation of the right that could result in a remedy such as a pretrial dismissal. Furthermore, as is impliedly conceded by Jones, the trial court docket below does not reflect he filed a speedy trial motion or invoked his right pretrial. Trial counsel for Jones indicated he joined in Eloby's motion to dismiss due to the violation of his right to a speedy trial. Yet our Supreme Court has made clear that "the filing of a motion to dismiss does not equate to an assertion of the right to a speedy trial." *Moffett v. State*, 49 So. 3d 1073, 1087 (¶39) (Miss. 2010).

¶88. As he did not invoke his right to a speedy trial, we find that this factor weighs against Jones.

### 4. *Prejudice*

¶89. "The final prong of *Barker* encompasses two aspects: actual prejudice in defending the case and interference with the defendant's liberty." *Bateman*, 125 So. 3d at 631 (¶51). "The three main considerations in determining whether the accused was prejudiced by a lengthy delay are: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id*. (internal quotation marks omitted). The defendant "bears the burden of showing actual prejudice, since the defendant is clearly in the best position to show prejudice under this prong." *Reed v. State*, 191 So. 3d 134, 141 (¶19) (Miss. Ct. App. 2016) (internal quotation marks omitted).

¶90. Here, Jones argues that he was prejudiced by the delayed trial in multiple ways. First,

Jones claims that the destruction of Chief Deputy Flowers's original notes and the inability to retrieve original recordings of witness statements materially impaired his ability to cross-examine, challenge, and impeach the State's evidence and witnesses. Jones also asserts that the "faded memories" of key witnesses undermined the integrity of the fact-finding process. Finally, Jones claims that he endured anxiety and suffered reputation harm while awaiting trial.

¶91. The State argues that none of Jones' claims of prejudice rises to the level of actual prejudice under *Barker*. The State also maintains that Jones was incarcerated for unrelated charges during approximately four years of the pretrial period, which further undercuts his claim of pretrial oppression. *See Wall v. State*, 718 So. 2d 1107, 1113 (¶26) (Miss. 1998) (recognizing that a defendant cannot claim anxiety of incarceration when serving time for another crime). We agree, and we find that Jones failed to meet his burden of showing actual prejudice.

### 5. *Summary of the* Barker *Factors*

¶92. "In weighing the *Barker* factors, we must consider the 'totality of the circumstances,' and 'no one factor is dispositive.'" *Berryman*, 337 So. 3d at 1131 (¶53) (quoting *Price v. State*, 898 So. 2d 641, 648 (¶11) (Miss. 2005)).

¶93. Of the four *Barker* factors, only the delay in this case favors Jones. As discussed, much of the delay in this case is attributed to the Defendants' motions for continuance of the trial date. Furthermore, Jones has not shown actual prejudice. Because we find no constitutional speedy trial violation in this case, we find that the trial court did not err in denying Jones' motion to dismiss based on a speedy-trial violation.

### B. The Statutory Right

¶94. To show a violation of our speedy trial statute, a defendant must have proof beyond that the law itself was broken. To show a violation, our Supreme Court "require[s] that a defendant show not only that he was tried more than 270 days after his arraignment, but that he sustained prejudice as well." *McBride*, 61 So. 3d at 147 (¶35).

¶95. As the Court phrased it in a successor case, under the State speedy trial statute, "absent good cause and a continuance, the State shall try a defendant for every indicted offense within 270 days." *Williams v. State*, 305 So. 3d 1122, 1133 (¶39) (Miss. 2020). But "non-compliance [with the statute] does not itself evince a violation of the defendant's rights." *Id*. at 1134 (¶39). "Indeed, a defendant must show the State not only violated the statute, but the violation resulted in actual prejudice to his or her defense." *Id*. at (¶39).

¶96. As set out above, Jones never invoked his right to a speedy trial, and in addition has not shown "actual prejudice" in his defense despite the delay in this case. Therefore we find no violation of his statutory right to a speedy trial.

### V. Jones did not preserve his firearm arguments at trial.

¶97. For his fifth issue, Jones takes issue with the "admi[ssion] of a gun that could not possibly be linked to this case," arguing it prejudiced his defense. "The 9mm [handgun] recovered during Eloby's traffic stop had no bearing on the crime at issue," he concludes.

¶98. During the testimony of Mark Boackle, an expert in the field of firearms and tool marks, the State sought to introduce the handgun as Exhibit S-9. All three Defendants vocalized that they had no objection.

¶99. "A defendant's failure to object to the admission of evidence at trial waives his right

28

to raise the issue on appeal." *Smith v. State*, 398 So. 3d 875, 890-91 (¶29) (Miss. Ct. App. 2023).  Accordingly, we find that Jones failed to preserve this argument for appeal.

### VI.     There was sufficient evidence to support Jones' indictment for capital murder.

¶100.  Like his co-defendant Eloby, on appeal Jones essentially argues that the State overcharged him since he was indicted for capital murder, with the underlying crime of burglary with the intent to "commit an assault and/or kill persons."  If we accept this premise, Jones argues "the State failed to meet" its combined burden of showing Jones intended to both take property from the victims and also assault and kill someone in the course of the burglary.

¶101.  Jones argues that the only evidence of the Defendants' intent was their intention to steal drugs, and because the State included assault and murder with the conjunctions "and" and "and/or," the State was required to prove all three.  In essence, he argues that the State increased its burden by using all three intended crimes.

> When reviewing a challenge to the sufficiency of the evidence, the Court considers each element of the offense and reviews all of the evidence in the light most favorable to the verdict. Th[e] Court must accept as true all credible evidence consistent with guilt. Th[e] Court must give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence. Moreover, matters regarding the weight and credibility given the evidence are the province of the jury. Th[e] Court may reverse only when, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty. Thus, if any rational trier of fact could have found each and every one of the elements of the crime beyond a reasonable doubt, when viewing the evidence in the light most favorable to the prosecution, the verdict must stand.

*Smith v. State*, 250 So. 3d 421, 424 (¶12) (Miss. 2018) (quoting *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015)).

¶102. The Defendants were charged with capital murder under Mississippi Code Annotated section 97-3-19(2)(e) (Rev. 2020), which requires proof of "the killing of a human being without the authority of law . . . by any person engaged in the commission of the crime of . . . burglary[.]" Proof of burglary requires evidence of breaking and entering with the intent to commit "some crime" inside. Miss. Code Ann. § 97-17-23(1) (Rev. 2020). The Supreme Court has held that "only the *intent* to commit some crime, be it a felony or a misdemeanor, is an element of the crime of burglary." *Quinn v. State*, 191 So. 3d 1227, 1233 (¶22) (Miss. 2016) (emphasis added).

¶103. The indictment charged the defendants with committing capital murder by killing Williams while "engaged in the crime of Burglary of a Dwelling by . . . breaking and entering the dwelling house at 66 Hunter Road, Drew, Mississippi, the property of Nathan Williams, with the intent to take[,] steal[,] and carry away personal property located therein and commit an assault and/or kill persons located therein." Jones does not argue that the State failed to prove the breaking and entering, Williams's death, or the intent to take, steal, or carry away personal property. He challenges the inclusion of "and commit an assault and/or kill persons located therein." Jones argues that the State increased its burden of proof by including the intent to assault and kill—he argues that the use of "and/or"[2] is a conjunctive, not disjunctive phrase—and that the State is bound to prove the Defendants entered the home with an intent

---

[2] Legal writing scholars have called this phrase an "unfortunate hybrid," a "drafting blemish," and "sloppy." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, at 125 (2012). Justice Scalia and Garner note that "[t]he literal sense of and/or is 'both or either,' so that 'A and/or B' means (1) 'A,' (2) 'B,' or (3) 'both A and B.'" *Id.* While it is not crucial to our decision on this issue, we agree that the "use of the sloppy and/or" should be avoided.

30

to steal, an intent to assault, and an intent to kill.

¶104. However, this argument does not comport with our caselaw. If burglary requires only proof of an intent to commit *some crime*, it does not follow that we must reverse a conviction predicated on burglary where there is uncontroverted proof of some crime (i.e., intent to steal) simply because the State included more crimes than necessary in its indictment.

¶105. The *Smith* case is instructive. 250 So. 3d at 421 (¶1). In *Smith*, the defendant challenged the sufficiency of the State's evidence of armed robbery, but did not argue that the State failed to prove all necessary elements. *Id.* at 424-25 (¶13). Instead, Smith claimed that the State's inclusion of the specific items taken during the robbery required the State to prove that each item was taken. The Supreme Court rejected Smith's argument, reasoning that it was well established that the armed robbery statute did not require that an indictment list the specific item that is the subject of the armed robbery, as it was not a necessary element. *Id.* at (¶14).

¶106. The Supreme Court held that the addition of the specific personal property in Smith's indictment "was not necessary to the indictment, [but] it also was not improper," noting that the inclusion of the specific personal property did not "implicate an additional substantive element not present in the armed robbery statute, nor [did] it change armed robbery to another potential crime." *Id.* at 427 (¶22). The Supreme Court also suggested that the State could have moved to amend the indictment to remove the specific items and the amendment would not have been a substantive change to the indictment, as it did not change the crime charged. *See id.* at 427-29 (¶¶21, 27, 28).

¶107. The Supreme Court concluded that the State proved every element of armed robbery

31

and that Smith was not entitled to a judgment of acquittal "because the jury clearly found at trial that the State's proof showed that personal property was taken from [the victim's] house during the robbery," satisfying the elements of armed robbery. *Id.* at 429 (¶28).

¶108. We acknowledge that the issue in *Smith* involved an indictment that listed specific personal items taken when it was clear that the specific items taken in an armed robbery were not necessary elements, whereas an indictment for capital murder predicated on burglary must include the underlying crime in the burglary. However, the rationale still stands—the inclusion of multiple intended crimes "was not necessary to the indictment, [but] it also was not improper." *Id.* at 427 (¶22).

¶109. Here, the State presented sufficient evidence to prove that the Defendants broke and entered Williams' home with an intent to commit a crime therein—to steal property (drugs). That satisfies the State's burden, and, like the defendant in *Smith*, Jones is not entitled to a judgment of acquittal "because the jury clearly found at trial that the State's proof showed" that the Defendants entered the home with an intent to steal drugs. *Id.* at 429 (¶28).

¶110. Additionally,

> [t]he State seldom has direct and positive testimony expressly showing the specific intent of an intruder at the time he unlawfully breaks into a dwelling house; however, such testimony is not essential to establish the intent to commit a crime. Some presumptions are to be indulged in against one who enters a building unbidden, at a late hour of night, else the burglar caught without boot[y] might escape the penalties of the law. Intent is an emotional operation of the mind, and it is usually shown by acts and declarations of the defendant coupled with facts and circumstances surrounding him at the time. Defendant's intention is manifested largely by the things he does.

*Cortez v. State*, 876 So. 2d 1026, 1030 (¶12) (Miss. Ct. App. 2003). The jury "is entitled to consider not only facts as testified to by witnesses, but all inferences that may be reasonably

and logically deduced from the facts and evidence." *Id.* at (¶13).

¶111. In this case, because eyewitnesses testified the intruders also had firearms, the jury could reasonably infer that the Defendants' "unbidden" entry into Williams' house "at a late hour of the night," while wearing masks and each armed with a weapon, evidenced not only an intent to rob, but also an intent and ability to assault or kill once inside. Direct testimony from a witness of the Defendants' intent was not necessary given the totality of the circumstances of the crime.

¶112. Accordingly, we find the State presented sufficient evidence of capital murder by proving that Williams' death occurred during a burglary and that the Defendants broke and entered Williams' home with the intent to commit some crimes therein. The fact that the State included multiple crimes for the underlying burglary did not increase its burden of proof, so Jones is not entitled to a judgment of acquittal.

### VII. Admitting the prior bad acts of Jones' co-defendant was not an abuse of discretion.

¶113. In his final substantive issue, Jones argues that "[t]he trial court improperly allowed Jabrandon Green to testify concerning prior bad acts that Jones's co-defendant Brown supplied weapons, drove to and from robberies, and scouted the target house." Jones claims this "unfairly prejudic[ed]" his defense.

¶114. There does not appear to be Mississippi caselaw directly on point for this situation where a co-defendant claims the admission of another co-defendant's prior bad acts has caused them prejudice. However, we have said in *dicta* that since "[t]he State has a legitimate interest in telling a rational and coherent story of what happened," the "[e]vidence

33

of prior bad acts, by the defendant or others, is admissible in instances where the prior bad acts are integrally related in time, place and fact with the crime for which the defendant is being tried." *Maggett v. State*, 230 So. 3d 722, 728 (¶13) (Miss. Ct. App. 2016) (quotation mark omitted) (addressing a severance argument). Both Jones and the State point this Court to a variety of federal cases, in and out of the Fifth Circuit, to advance their arguments.

¶115. "Generally, evidence of other crimes, wrongs, or acts is prohibited to prove a person's character in order to show he acted in accordance with that character." *Culberson v. State*, 419 So. 3d 926, 940 (¶59) (Miss. Ct. App. 2025); MRE 404(b)(1). However, under Mississippi Rule of Evidence 404(b)(2), evidence of other crimes may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). Before a trial court admits such evidence, the court "must find (1) the evidence is offered for a permissible purpose under Rule 404(b)[,] . . . and (2) the evidence's probative value outweighs its prejudicial effect under Rule 403[.]" *Parks v. State*, 228 So. 3d 853, 868 (¶58) (Miss. Ct. App. 2017). We review a trial court's decision to admit evidence of a defendant's other crimes, wrongs, or acts for an abuse of discretion. *Bradshaw v. State*, 371 So. 3d 822, 836 (¶41) (Miss. Ct. App. 2023).

¶116. We first note that this argument "does not fit squarely within the confines of Rule 404(b)(1)." *Terry v. State*, 412 So. 3d 1274, 1281 (¶30) (Miss. Ct. App. 2025). "The plain text of the Rule specifies that the prohibited uses of an individual's 'crimes, wrongs, or other acts' for purposes of proving character are confined to the acts of that individual, not others." *Id*. So evidence of Brown's other prior bad acts could not and was not admitted to prove

34

Jones' character or to show that he acted in accordance with Brown's character.

¶117. The State maintains that the testimony about Brown's other wrongs, crimes, or acts was properly admitted under Rule 404(b) to demonstrate a common plan, intent, and motive relevant to the charged offense among Brown, Eloby, and Jones. The State asserts that the evidence was offered for a non-character purpose and was highly probative of a broader scheme involving the four accomplices and their charged acts.

¶118. The record indicates that Brown submitted a motion in limine to exclude evidence of his other wrongs, crimes, or acts and that Eloby and Jones joined the motion. The trial court held a pretrial hearing on the motion.

¶119. At the hearing, the State announced that it intended to offer evidence of Brown's other crimes to prove "intent, preparation, motive, and plan and . . . modus operandi." The State explained that Green would testify that the details of the shooting and robbery at issue are "identical" to subsequent crimes that Green and Brown had committed in other counties, namely, that Brown was always involved in the preparation of the robbery and always drove to the location, and that Green and another person would always exit the vehicle and commit the robbery.

¶120. The trial court denied Brown's motion and ruled that pursuant to Rule 404(b), the State could introduce evidence of Brown's criminal activity for the limited purposes of intent, plan, preparation, motive, and opportunity and "to tell a complete story of the events leading to the subject incident."

¶121. During Green's testimony at trial, Brown's counsel renewed her objection to Green testifying about Brown's other crimes. The trial court overruled the objection and allowed

35

the testimony for the limited purpose of showing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The trial court referenced its prior written order and stated that the court had already made a determination that the testimony's "probative value is not outweighed by any prejudice that it will cause."

¶122. Green testified that he was currently serving time for aggravated assault, kidnapping, robbery, and attempted robbery. Green stated that these charges arose from crimes that occurred approximately a month after the shooting and robbery at issue in this case—an incident in Tallahatchie County on September 7, 2012, and an incident in Leflore County on September 11, 2012. Green testified that Brown was also involved in these crimes and that Brown had served time on charges stemming from these crimes.

¶123. During Green's testimony, the State asked Green if he had any knowledge of Brown's other bad acts. Green answered that he did have knowledge of other crimes Brown had committed, and Green explained that he had knowledge of these crimes because he was also involved. The State asked Green about the crime that occurred on September 7, 2012. Green testified that Brown provided him with "the information and the spot." The State then asked, "And that's the same plan that you guys had when you were here in Sunflower County?" referring to the shooting and robbery at issue. Green answered, "Yes."

¶124. The State also asked Green about the crime that occurred a few days later, on September 11, 2012. Green stated that in that incident, Brown provided the "[i]nformation, transportation, and weapon and mask." Green clarified that Brown informed Green of a store that had illegal slot machines in the back of the store. Brown drove Green to the store and dropped him off, and Green robbed the store.

36

¶125. The State sought to introduce the other acts by Brown and Green to explain to the jury the background and modus operandi of the Defendants—that they worked as a crew, that they had particular victims, and how they executed their common schemes. As has long been established, "the [S]tate has a legitimate interest in telling a rational and coherent story of what happened." *Terry*, 412 So. 3d at 1280 (¶28). In the end, "[t]he weighing and balancing task required by Rule 403 asks only that a judge rely on his/her own sound judgment." *Masters v. State*, 285 So. 3d 192, 197 (¶16) (Miss. Ct. App. 2019) (quoting *O'Connor v. State*, 120 So. 3d 390, 398 (¶20) (Miss. 2013)). The trial court found that the probative value of the other bad acts regarding other robberies was not substantially outweighed by the danger of unfair prejudice.

¶126. Furthermore, at the conclusion of Green's testimony, the trial court gave the jury the following limiting instruction:

> Members of the jury, the Court allowed evidence of other robberies allegedly committed by Defendants Green and Brown to be admitted into evidence in this case. You may consider this evidence only as to Defendants Green and Brown for the limited purpose of intent, plan, preparation, motive, and opportunity. You may not infer that they acted in conformity with the prior acts or that they are, therefore, guilty of the charge for which they are presently on trial. **You cannot, and must not, consider the evidence against the defendants who did not participate in these other robberies**.

(Emphasis added).

¶127. This careful limiting instruction acted to safeguard the use of the prior bad acts of Brown and Green from being used as proof that *Jones* committed the crimes for which he was indicted. The trial judge also instructed the jury that the evidence regarding the other robberies was admitted for the limited purpose of showing intent, plan, preparation, motive,

37

and opportunity.  We do not find this was an abuse of discretion.

**VIII.   There are no cumulative errors warranting reversal of Jones' case.**

¶128.  Jones' last argument requests that this Court reverse on the grounds of cumulative error. Because we find that there were no errors in the trial below, we decline Jones' argument that we should reverse for cumulative error.

**CONCLUSION**

¶129.  For each of the reasons expounded above, we affirm Carlos Jones' convictions and sentences.

¶130.  **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**